**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| THE OKLAHOMA DEPARTMENT OF ) | |
| ENVIRONMENTAL QUALITY, ) | |
| ) | |
| and ) | |
| ) | |
| THE STATE OF ALABAMA and THE ALABAMA ) | |
| DEPARTMENT OF ENVIRONMENTAL ) | |
| MANAGEMENT, ) | |
| ) | |
| Plaintiff-Intervenors, ) | |
| ) | |
| v. ) | Case Number: 5:15-cv-00290-F |
| ) | |
| CONTINENTAL CARBON COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**CONSENT DECREE**

## TABLE OF CONTENTS

I. JURISDICTION AND VENUE .................................................................3

II. APPLICABILITY.................................................................................4

III. DEFINITIONS ...................................................................................5

IV. CIVIL PENALTY ..............................................................................25

V. ENVIRONMENTAL MITIGATION ....................................................26

VI. SO$_2$ CONTROL TECHNOLOGY, EMISSIONS LIMITS, AND MONITORING
    REQUIREMENTS ............................................................................28

VII. NO$_x$ CONTROL TECHNOLOGY, EMISSIONS LIMITS, AND MONITORING
    REQUIREMENTS ............................................................................32

VIII. PM CONTROL TECHNOLOGY, EMISSIONS LIMITS, BEST MANAGEMENT
    PRACTICES, AND EARLY WARNING SYSTEM REQUIREMENTS.......................37

IX. PROHIBITION ON USE OF SUNRAY NON-ASSISTED FLARES .............................39

X. PROHIBITION ON NETTING CREDITS OR OFFSETS ................................................40

XI. PERMITS.........................................................................................41

XII. REVIEW AND APPROVAL OF SUBMITTALS ................................................45

XIII. RECORDKEEPING AND REPORTING REQUIREMENTS ...................................47

XIV. STIPULATED PENALTIES.................................................................53

XV. FORCE MAJEURE ..........................................................................58

XVI. AFFIRMATIVE DEFENSES TO CERTAIN STIPULATED PENALTIES ...............61

XVII. DISPUTE RESOLUTION.................................................................63

XVIII. INFORMATION COLLECTION AND RETENTION ...............................................66

XIX. EFFECT OF SETTLEMENT / RESERVATION OF RIGHTS....................................69

XX. COSTS............................................................................................71

XXI. NOTICES .......................................................................................71

XXII. EFFECTIVE DATE..........................................................................74

**XXIII. RETENTION OF JURISDICTION** .................................................................**74**

**XXIV. MODIFICATION** .........................................................................................**74**

**XXV. SALES OR TRANSFER OF OPERATIONAL OR OWNERSHIP INTERESTS** .....**74**

**XXVI. PUBLIC PARTICIPATION** ...........................................................................**76**

**XXVII. TERMINATION** .........................................................................................**76**

**XXVIII. SIGNATORIES/SERVICE** .........................................................................**79**

**XXIX. INTEGRATION** ...........................................................................................**80**

**XXX. FINAL JUDGMENT** ....................................................................................**80**

**XXXI. APPENDICES** ............................................................................................**80**

**APPENDIX A:  ENVIRONMENTAL MITIGATION PROJECTS** ...................................**A1**

**APPENDIX B:  OTHER PM CONTROL REQUIREMENTS** ..........................................**B1**

**APPENDIX C:  PARTICULATE EMISSIONS BEST MANAGEMENT PRACTICES
     CONTROL PLAN** ...........................................................................................**C1**

**APPENDIX D:  PM EARLY WARNING SYSTEM** ....................................................**D1**

**APPENDIX E:  PROTOCOL FOR SETTING FINAL SO$_2$ EMISSION LIMITS** ..............**E1**

**APPENDIX F:  PROTOCOL FOR SETTING FINAL NO$_x$ EMISSION LIMITS AT
     SUNRAY** .....................................................................................................**F1**

WHEREAS, Plaintiff, the United States of America ("the United States"), on behalf of the United States Environmental Protection Agency ("EPA"), is concurrently with this Consent Decree filing a complaint ("Complaint") against Continental Carbon Company ("Defendant") pursuant to Sections 113(b) and 167 of the Clean Air Act ("Clean Air Act" or "the Act"), 42 U.S.C. §§ 7413(b) and 7477. The Complaint seeks injunctive relief and the assessment of civil penalties for violations of one or more of the following statutory and regulatory requirements of the Act at Defendant's Ponca City, Phenix City, and Sunray carbon black facilities: the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-7492; the nonattainment New Source Review ("Nonattainment NSR") provisions of the Act, 42 U.S.C. §§ 7501-7515; the federally-approved and enforceable Alabama, Texas and Oklahoma State Implementation Plans ("SIPs"), which incorporate and/or implement the above-listed federal PSD and/or Nonattainment NSR requirements; and Title V of the Act, 42 U.S.C. §§ 7661-7661f and/or Title V's implementing federal and state regulations;

WHEREAS, EPA contends that this settlement is part of EPA's national enforcement initiative to control air pollution from the largest sources of emissions, including carbon black manufacturing facilities;

WHEREAS, the Oklahoma Department of Environmental Quality ("ODEQ"), an official agency of the State of Oklahoma to which the Oklahoma Legislature has delegated the power and duty to enforce the Oklahoma Statutes, including the authority to bring actions in courts of competent jurisdiction for violations of the Oklahoma Statutes, Oklahoma's SIP and/or other state rules and regulations incorporating and implementing Clean Air Act requirements (See 27A OKLA. STAT. § 2-3-101(B)(2)), and the State of Alabama, on behalf of the Alabama Department of Environmental Management ("ADEM")  ("Plaintiff-Intervenors"), have

1

concurrently with this Consent Decree filed Complaints in Intervention (collectively with the Complaint filed by the United States, "Complaints"), joining the claims alleged by the United States and asserting their own claims against Defendant pursuant to Sections 113(b) and 167 of the Clean Air Act ("Clean Air Act" or "the Act"), 42 U.S.C. §§ 7413(b) and 7477;

WHEREAS, the Complaints allege, *inter alia*, that Defendant failed to obtain the necessary permits and install and Continuously Operate the controls necessary to reduce sulfur dioxide ("$SO_2$"), nitrogen oxides ("$NO_x$") and particulate matter ("PM"), including without limitation particulate matter with a diameter of ten microns or less ("PM10"), and comply with requirements for monitoring, record-keeping, and reporting, as specified in the Act;

WHEREAS, EPA provided Defendant, ODEQ, the State of Alabama, and the State of Texas, with actual notice of the alleged violations, in accordance with Sections 113(a)(1) and (b) of the Clean Air Act, 42 U.S.C. §§ 7413(a)(1);

WHEREAS, Defendant stipulates for purposes of this Consent Decree that it does not contest the adequacy of the notice provided;

WHEREAS, Defendant does not admit any liability to the United States or Plaintiff-Intervenors (collectively "Plaintiffs") arising out of the acts or omissions alleged in the Complaints and this Consent Decree resolves all allegations stated in the Complaints;

WHEREAS, Defendant conducted, and shared with EPA the results of, (1) Control Technology testing information, (2) stack testing of $SO_2$ and $NO_x$ emission rates for certain sources specified in the Consent Decree, and (3) alarm action level information and manufacturer specifications related to the alarm action levels for the PM Early Warning Systems at Ponca and Phenix;

2

WHEREAS, prior to lodging this Consent Decree Plaintiffs determined that the PM alarm systems in place at Ponca and Phenix as of the Date of Lodging satisfy the definition of PM Early Warning System in this Consent Decree;

WHEREAS, the Plaintiffs and Defendant (collectively "the Parties") have agreed that settlement of this action is in the public interest and will result in air quality improvements, and that entry of this Consent Decree without further litigation is the most appropriate means of resolving this matter; and

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), below, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED AND DECREED as follows:

## I.  JURISDICTION AND VENUE

1.	This Court has jurisdiction over this action, the subject matter herein, and over the Parties consenting hereto, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, and pursuant to Sections 113, 167, and 304 of the Act, 42 U.S.C. §§ 7413, 7477, and 7604.

2.	Venue lies in this district pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. § 1391(b) and (c), because some of the violations alleged in the Complaints are alleged to have occurred in, and Defendant resides in and conducts business in, this district.

3.     At least 30 Days prior to the Date of Lodging of this Consent Decree, EPA notified the States of Alabama, Texas, and Oklahoma, and Defendants of the violations alleged in the Complaints, as required by Section 113(a)(1) of the CAA, 42 U.S.C. § 7413(a)(1).

4.     Solely for purposes of this Consent Decree and the underlying Complaints, and any action to enforce this Consent Decree, Defendant consents to this Court's jurisdiction over Defendant and any action to enforce this Consent Decree and to venue in this judicial district. Defendant consents to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.  Except as expressly provided for herein, this Consent Decree shall not create any rights in or obligations of any Party other than the Parties to this Consent Decree.

5.     Except as provided in Section XXVI (Public Participation) of this Consent Decree, the Parties consent to entry of this Consent Decree without further notice.

## II. APPLICABILITY

6.     Upon the Effective Date, the obligations of this Consent Decree shall apply to, and be binding upon, the United States, the Plaintiff-Intervenors, and upon Defendant and any successors, assigns, or other entities or persons otherwise bound by law.

7.     Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties include compliance with any provision of this Decree, as well as to any Contractor retained to provide services required to comply with the provisions of this Consent Decree.  Defendant shall condition any agreement with such Contractor upon performance of the services in conformity with the provisions of this Consent Decree.  In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or Contractors to take any actions necessary to comply with the

4

provisions of this Consent Decree.  Notwithstanding any retention of any such entities to perform

any work required under this Consent Decree, Defendant shall ensure that all work is performed

in accordance with the requirements of this Consent Decree.

### III.  DEFINITIONS

8.      Terms used in this Consent Decree that are defined in the Act or in regulations

promulgated by EPA pursuant to the Act shall have the meanings assigned to them in the Act or

such regulations, unless otherwise provided in this Decree.  Whenever the terms set forth below

are used in this Consent Decree, the following definitions shall apply:

a.      "3-hour Average Emissions Limit" shall mean the limit on average hourly

emissions specified in Paragraph 31, determined in accordance with

Paragraph 32, of this Consent Decree (subject to Section XVI, below).

b.      "7-day Rolling Average Emissions Limit" shall mean the limit on average

daily emissions during the preceding seven Operating Days, specified in

Paragraphs 17 and 26.  For purposes of clarity, to calculate the average

daily emissions to compare against the limit, the first complete 7-day

average compliance period is seven Operating Days after the Date of

Continuous Operation (e.g., if the Date of Continuous Operation is

January 1, the first Day in the averaging period is January 1 and the first

complete 7-day average compliance period is January 1 – January 7,

provided each Day qualifies as an Operating Day), and  all emissions that

occur during the specified period, including emissions during all periods

of Malfunction (subject to Section XVI, below) within an Operating Day,

shall be included in the calculation.

5

c.   "30-day Rolling Average Sulfur Content Weight Percent" shall mean the arithmetic average of weighted daily average sulfur contents in feedstock to all reactors as a weight percent during the preceding 30 Operating Days, as specified in Paragraph 21.  It shall equal $S_{30}$ and shall be calculated as follows:

$$S_{30} = \sum_{j=1}^{30} \left[ \sum_{i=1}^{n} \left( \frac{100 * M_{S,i,j}}{M_{F,T,j}} \right) \right] / 30$$

Where:

$\sum_{j=1}^{30}$   = Sum from Day 1 through Day 30

$n$ = Number of reactors at the Sunray plant

$\sum_{i=1}^{n}$ = Sum for reactors 1 through n

$M_{S,i,j}$ = Mass of sulfur in the feedstock delivered to reactor i in a Day j, in pounds, as measured by a continuous mass flow monitoring system

Where:

$$M_{S,i,j} = (S_{F,i,j} * M_{F,i,j})/100$$

$S_{F,i,j}$ = The average sulfur content of the feed to reactor i in Day j, in weight percent, as derived using the sulfur contents for each feedstock receiving tank feeding the reactor by Paragraph 22.a or 22.b

Where:

$$S_{F,i,j} = 100 * \sum_{k=1}^{m} (S_{T,k,j} * M_{T,k,j}) / (100 * M_{F,i,j})$$

$m$ = Number of feedstock receiving tanks at the Sunray plant

$S_{T,k,j}$ = The sulfur content of the feed delivered from receiving tank k to reactor i in Day j, in weight percent, as derived for each feedstock receiving tank feeding the reactor by Paragraph 22.a or 22.b

6

$M_{T,k,j}$ = Total mass of feedstock delivered from receiving tank k to reactor i in Day j, in pounds, as measured by a continuous mass flow monitoring system

$M_{F,i,j}$ = Total mass of feedstock pounds delivered to reactor i from all receiving tanks in a calendar Day j, in pounds, as measured by a continuous mass flow monitoring system

$M_{F,T,j}$ = Total mass of feedstock delivered to all reactors in a calendar Day j, in pounds, as measured by a continuous mass flow monitoring system

Where:

$$M_{F,T,j} = \sum_{i=1}^{n} M_{F,i,j}$$

For purposes of clarity, the first complete 30-day average compliance period is 30 Operating Days after the Date of Continuous Operation (e.g., if the Date of Continuous Operation is January 1, the first Day in the averaging period is January 1 and the first complete 30-day average compliance period is January 1 - January 30, provided each Day qualifies as an Operating Day).

d.  "365-day Rolling Average Emissions Limit" shall mean the limit on average daily emissions during the preceding 365 Operating Days, specified in Paragraphs 17 and 26.  For purposes of clarity, to calculate the average daily emissions to compare against the limit, the first complete 365-day average compliance period is 365 Operating Days after the Date of Continuous Operation (e.g., if the Date of Continuous Operation is January 1, the first Day in the averaging period is January 1 and the first complete 365-day average compliance period is January 1 - December 31, provided each Day qualifies as an Operating Day), and all emissions that

7

occur during the specified period, including emissions during all periods of Malfunction within an Operating Day, shall be included in the calculation.

e.    "365-day Rolling Average Sulfur Content Weight Percent" shall mean the arithmetic average of weighted daily average sulfur contents in feedstock to all reactors as a weight percent during the preceding 365 Operating Days, specified in Paragraph 21. It shall equal $S_{365}$ and shall be calculated as follows:

$$S_{365} = \sum_{j=1}^{365} \left[ \sum_{i=1}^{n} \left( \frac{100 * M_{S,i,j}}{M_{F,T,j}} \right) \right] / 365$$

Where:

$\sum_{j=1}^{365}$ = Sum from Day 1 through Day 365

$n$ = Number of reactors at the Sunray plant

$\sum_{i=1}^{n}$ = Sum for reactors 1 through n

$M_{S,i,j}$ = Mass of sulfur in the feedstock delivered to reactor i in a calendar Day j, in pounds, as measured by a continuous mass flow monitoring system

Where:

$$M_{S,i,j} = (S_{F,i,j} * M_{F,i,j})/100$$

$S_{F,i,j}$ = The average sulfur content of the feed to reactor i in Day j, in weight percent, as derived using the sulfur contents for each feedstock receiving tank feeding the reactor by Paragraph 22.a or 22.b

Where:

$$S_{F,i,j} = 100 * \sum_{k=1}^{m} (S_{T,k,j} * M_{T,k,j}) / (100 * M_{F,i,j})$$

$m$ = Number of feedstock receiving tanks at the Sunray plant

8

$S_{T,k,j}$ = The sulfur content of the feed delivered from receiving tank k to reactor i in Day j, in weight percent, as derived for each feedstock receiving tank feeding the reactor by Paragraph 22

$M_{T,k,j}$ = Total mass of feedstock delivered from receiving tank k to reactor i in Day j, in pounds, as measured by a continuous mass flow monitoring system

$M_{F,i,j}$ = Total mass of feedstock pounds delivered to reactor i from all receiving tanks in a Day j, in pounds, as measured by a continuous mass flow monitoring system

$M_{F,T,j}$ = Total mass of feedstock delivered to all reactors in a calendar Day j, in pounds, as measured by a continuous mass flow monitoring system

*Where:*

$$M_{F,T,j} = \sum_{i=1}^{n} M_{F,i,j}$$

For purposes of clarity, the first complete 365-day average compliance period is 365 Operating Days after the Date of Continuous Operation (e.g., if the Date of Continuous Operation is January 1, the first Day in the averaging period is January 1 and the first complete 365-day average compliance period is January 1 - December 31, provided each Day qualifies as an Operating Day).

f.    "365-day Rolling Sum Emissions Limit" shall mean the limit on the sum of daily emissions during the preceding 365 Days, specified in Paragraph 23. For purposes of clarity, to calculate the sum of daily emissions to compare against the limit, the first complete 365-day compliance period is 365 Days after the Date of Continuous Operation (e.g., if the Date of Continuous Operation is January 1, the first Day in the period is January 1

9

and the first complete 365-day compliance period is January 1 - December 31, provided each Day qualifies as an Operating Day), and all emissions that occur during the specified period, including emissions during all periods of Malfunction within an Operating Day, shall be included in the calculation.

g. "Alternative Equivalent Pollution Control Technology" shall mean an alternative equivalent pollution control technology installed in accordance with the requirements of Paragraph 19 or 28.

h. "Boiler Water Custody Transfer Meter" shall mean the meter that shall continuously monitor the water transferred by the Refinery to support operation of the Low NOx Combustion System at Sunray under contract between the Refinery and Defendant.  The meter shall be capable of producing reports documenting boiler water transfers, including any reductions in boiler water provided by the Refinery of 25% or more below the Contracted for Amount of Boiler Water.

i. "Business Day" shall mean any Day, except for Saturday, Sunday, and state and federal holidays.

j. "Calendar Year" shall mean a 12-Month period.

k. "CD Emissions Reductions" shall mean any emissions reductions that result from any projects conducted or controls used to comply with this Consent Decree except for Surplus Emission Reductions.

l. "CEMS" or "Continuous Emission Monitoring System" shall mean, for obligations involving $NO_x$ and $SO_2$ under this Consent Decree, the devices

10

defined, installed, calibrated, maintained, and operated in accordance with 40 C.F.R. § 60.13 and 40 C.F.R. Part 60 Appendices A, B and F.

m. "Clean Air Act" or "Act" shall mean the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

n. "Consent Decree" or "Decree" shall mean this Decree and the Appendices attached hereto, but in the event of any conflict between the text of this Decree and any Appendix, the text of this Decree shall control.

o. "Continuously Operate" or "Continuous Operation" shall mean that, unless otherwise specified, when a Control Technology or a PM Early Warning System is used pursuant to the terms of this Consent Decree, it shall be operated at all times of Process System Operation, consistent with good engineering and maintenance practices for such Control Technology, PM Early Warning System or the Process System, as applicable, and good air pollution control practices for minimizing emissions in accordance with 40 C.F.R. § 60.11(d).

p. "Contracted For Amount Of Boiler Water" shall mean, pursuant to contract between the Refinery and Defendant, the amount of water to be provided by the Refinery to ensure normal operation of the Low NOx Combustion System at Sunray.

q. "Contracted For Amount Of Steam" shall mean, pursuant to contract between the Refinery and Defendant, the full capacity amount of steam to be provided by Defendant to the Refinery.

r. "Contractor" shall mean any person or entity hired by Defendant to

11

perform services on its behalf necessary to comply with the provisions of this Consent Decree.

s.  "Control Technology" shall mean each Selective Catalytic Reduction System, Wet Gas Scrubber, Dry Gas Scrubber, Low NOx Combustion System, or Alternative Equivalent Pollution Control Technology, installed pursuant to the terms of this Consent Decree, or the PM control mechanisms identified in Appendix B of this Consent Decree.

t.  "Date of Continuous Operation" shall mean the date by which Defendant shall Continuously Operate a Control Technology on a Process System.

u.  "Date of Lodging of the Consent Decree" or "Date of Lodging" shall mean the date the Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Western District of Oklahoma.

v.  "Day" shall mean a calendar day unless expressly stated to be a Business Day, and means a 24-hour period measured from midnight to midnight.

w.  "Defendant" or "Continental" shall mean Continental Carbon Company.

x.  "Dry Gas Scrubber" or "DGS" shall mean a pollution control device that removes $SO_2$ from flue gas by injecting a reagent in one or more absorber vessels designed to provide intimate contact and to react with and remove $SO_2$ from the flue gas stream forming a dry particulate containing reaction products and unreacted reagent which is captured in a particulate control device.

y.  "Dryer Exhaust Bag Filter" shall mean a high-efficiency fabric filtration

12

unit which, during periods of carbon black production, receives water vapor, combusted by-product gases, and carbon black from the carbon black pellet dryer and separates the carbon black from the water vapor and combusted by-product gases.

z.   "Effective Date" shall have the meaning set forth in Section XXII (Effective Date).

aa.   "Emissions Limit" shall mean the maximum allowable emissions in units as specified in this Consent Decree, measured in accordance with this Consent Decree, met to the number of significant digits in which the limit is expressed.  For example, an Emissions Limit of 0.100 is not met if the actual emission is 0.101.  The fourth significant digit shall be rounded to the nearest third significant digit, or the third significant digit to the nearest second significant digit, depending upon whether the limit is expressed to three or two significant digits.  For example, if an actual emission is 0.1004, that shall be reported as 0.100, and shall be in compliance with an Emission Limit of 0.100, and if an actual Emission Limit is 0.1005, that shall be reported as 0.101, and shall not be in compliance with an Emission Limit of 0.100.  The following Emissions Limits are specified in this Consent Decree:  3-hour Average Emissions Limit, 7-day Rolling Average Emissions Limit, 365-day Rolling Average Emissions Limit, 365-day Rolling Sum Emissions Limit, Final 7-day Rolling Average Emissions Limit, Final 365-day Rolling Average

13

Emissions Limit, Interim 7-day Rolling Average Emissions Limit, Interim 365-day Rolling Average Emissions Limit.

bb.   "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

cc.   "Environmental Mitigation Project" shall mean a project funded or implemented by Defendant as a remedial measure to mitigate alleged harm to human health or the environment claimed to have been caused by the alleged violations described in the Complaints.

dd.   "Facilities" shall mean Ponca, Phenix, and Sunray, the Defendant's facilities used for the manufacture of carbon black, each of which may be referred to as a "Facility."

ee.   "Final 7-day Rolling Average Emissions Limit" shall mean the applicable Final 7-day Rolling Average Emissions Limit set forth in the table in Paragraph 17 or Paragraph 26 and established pursuant to the protocol specified in Appendix E or Appendix F.

ff.   "Final 365-day Rolling Average Emissions Limit" shall mean the applicable Final 365-day Rolling Average Emissions Limit set forth in the table in Paragraph 17 or Paragraph 26 and established pursuant to the protocol specified in Appendix E or Appendix F.

gg.   "Flare" shall mean a combustion device that uses an uncontrolled volume of ambient air to burn gases.

hh.   "gr/dscf" shall mean grains per dry standard cubic foot.

ii.   "Heat Load Operation" shall mean the operation of any carbon black

14

reactor, boiler or dryer combustor at a Facility under any of the following conditions:  (1) at a reactor, when there is no oil feed but only natural gas and combustion air supplied to the reactor burner, and the reactor is not manufacturing carbon black and generating Tail Gas, including, but not limited to, during periods of Startup and Shutdown, (2) at a reactor, during the periods either prior to or at the conclusion of Process System Operation, each of which shall be as short as practicable and shall not exceed 10 minutes, when transitioning between (A) an operational mode in which oil, natural gas, and combustion air are all fed to the reactor burner and the reactor is manufacturing carbon black and generating Tail Gas, and (B) an operational mode, including, but not limited to, during periods of Startup and Shutdown, in which no oil but only natural gas and combustion air are supplied to the reactor, or (3) at a boiler, when there is no oil feed to the reactors but only natural gas and combustion air (and not Tail Gas generated by a reactor during Process System Operation) are fed to the boiler, including, but not limited to, during periods of Startup and Shutdown, (4) at a dryer combustor, when only natural gas and combustion air (and not Tail Gas generated by a reactor during Process System Operations) are fed to the dryer combustor, including, but not limited to, during periods of Startup and Shutdown.

jj.      "Inspection at the Low NOx Combustion System" shall mean the outage at the Low NOx Combustion System at Sunray to inspect and maintain the Low NOx Combustion System.  For purposes of Section IX (Prohibition

On Use Of Sunray Non-Assisted Flares) of this Decree, the outage shall not exceed 168 hours in duration and may not be conducted more frequently than once every 12 Months as necessary to comply with American Society for Testing and Materials and insurance requirements.

kk.   "Interim 7-day Rolling Average Emissions Limit" shall mean the applicable Interim 7-day Rolling Average Emissions Limit set forth in the table in Paragraph 17 or Paragraph 26.

ll.   "Interim 365-day Rolling Average Emissions Limit" shall mean the applicable Interim 365-day Rolling Average Emissions Limit set forth in the table in Paragraph 17 or Paragraph 26.

mm.   "kg FS/hr" shall mean kilograms of feedstock per hour.

nn.   "Low-NOx Combustion System" shall mean the combination of Low-NOx Burners, Overfire Air, and a boiler, together used to control the flame temperature and mixing characteristics of fuel and oxygen, thus minimizing the formation of NOx during combustion of fuel in the boiler, where "Low-NOx Burner" shall mean a NOx burner that is designed to meet 0.08 lb/mmbtu of NOx emissions when firing natural gas.

oo.   "Main Bag Filter" shall mean a high-efficiency fabric filtration unit, equipped with bag filters or their equivalent, which, during periods of carbon black production, receives carbon black and Tail Gas from the reactor and separates the carbon black from the Tail Gas.

pp.   "Malfunction" as used in this Consent Decree shall have the same meaning as defined at 40 C.F.R. § 60.2.

16

qq.    "Method 9" shall mean the methodology in 40 C.F.R. Part 60, Appendix A.

rr.    "Method 9 Trained Observer" shall mean a person who is trained in conducting visual assessments pursuant to Method 9.

ss.    "Method for Managing PM Emissions" shall mean the method for managing PM emissions identified in the third column of Appendix B.

tt.    "Month" shall mean a calendar month.

uu.    "National Ambient Air Quality Standards" or "NAAQS" shall mean national ambient air quality standards that are promulgated pursuant to Section 109 of the Act, 42 U.S.C. § 7409.

vv.    "$NO_x$" shall mean oxides of nitrogen, measured in accordance with the provisions of this Consent Decree.

ww.    "Non-Assisted Flare" shall mean a Flare that is not assisted by steam or by air.

xx.    "Nonattainment NSR" shall mean the nonattainment area New Source Review program within the meaning of Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515, 40 C.F.R. Part 51, and any applicable State Implementation Plan.

yy.    "Notices of Violation" shall mean the notices of violation issued by the EPA to Continental on May 24, 2012.

zz.    "ODEQ" shall mean the Oklahoma Department of Environmental Quality.

aaa.    "Operating Day" shall mean any Day of Process System Operation.

bbb.    "Optimization and Demonstration Study" shall mean (a) a study to

17

optimize and demonstrate the performance of a DGS, WGS or Alternative Equivalent Pollution Control Technology to minimize $SO_2$ emissions from the applicable Process System in accordance with the requirements of Paragraph 3 of Appendix E of this Consent Decree, or (b) a study to optimize and demonstrate the performance of a Low $NO_x$ Combustion System or Alternative Equivalent Pollution Control Technology to minimize $NO_x$ emissions from the Sunray Process System in accordance with the requirements of Paragraph 3 of Appendix F of this Consent Decree.

ccc.   "Over-Fire Air" shall mean an in-furnace staged combustion control which limits the amount of combustion air introduced into the burner zone theoretically required to burn all of the fuel.  Additional combustion air is then introduced after the burner zone through overfire air ports to complete the combustion of fuel.  The staged combustion of overfire air reduces the oxygen concentrations in the lower furnace, thereby limiting the oxidation of fuel bound nitrogen and the formation of fuel $NO_x$.

ddd.   "Paragraph" shall mean a portion of this Decree identified by an Arabic numeral.

eee.   "Particulate Emissions Best Management Practices Control Plan" shall mean the plan for identifying sources of particulate emissions and the measures to reduce such emissions that is reflected in Appendix C to this Consent Decree.

18

fff.    "Parties" shall mean the United States, Plaintiff-Intervenors, and

Defendant.

ggg.    "Party" shall mean one of the Parties.

hhh.    "Phenix" shall mean Defendant's carbon black facility located at

> 1500 East State Docks Road
> Phenix City, Alabama  36869

iii.    "Plaintiff-Intervenors" shall mean the ODEQ and the State of Alabama,

on behalf of ADEM.

jjj.    "Plaintiffs" shall mean the United States and Plaintiff-Intervenors.

kkk.    "PM" shall mean filterable particulate matter, measured in accordance

with Paragraph 32 of this Consent Decree.

lll.    "PM Early Warning System" shall mean a probe electrification-type

technology (i.e., a system in which a probe is inserted into the emissions

stream and measures the momentum of the PM flowing through the duct),

or a monitoring system designed to achieve an equivalent level of

performance to a probe electrification-type technology that has been

approved in advance of use by the EPA, that provides early warning

detection of excess PM emissions from carbon black production

operations by producing a signal that is transmitted to an alarm

management system and converted into a numeric readout, over an

averaging period of no longer than 15 minutes, as described in Appendix

D to this Consent Decree.

19

mmm.  "PM Emissions Equipment" shall mean the PM emissions equipment

identified in the first column of Appendix B.

nnn.  "PM Monitor Point" shall mean the point at which the PM Early Warning

System is installed to measure the PM flowing through the duct of each of

the Main Bag Filter, and Dryer Exhaust Bag Filter.

ooo.  "PM Reduction Mechanism" shall mean the PM reduction mechanism

identified in the middle column of Appendix B.

ppp.  "Ponca" shall mean Defendant's carbon black facility located at

> 1006 E Oakland Ave.
> Ponca City, OK 74601

qqq.  "ppmvd" means parts per million, volumetric dry.

rrr.  "Process System" shall mean, collectively, all Tail Gas generating and

Tail Gas combustion equipment, including, all feedstock heaters,

preheaters, reactors, dryers, thermal oxidizers, and boilers, necessary for

the manufacture of carbon black, at a designated Facility, except that, at

Sunray, the Process System shall not include the dryers.

sss.  "Process System Operation" shall mean the operation of any Process

System or any of its constituent parts when there is oil feed to any reactor

burners within such Process System, and the reactor is manufacturing

carbon black.  Process System Operation ends when oil feed to the reactor

burners within such Process System ceases; provided however that any

period of operation meeting the definition of Heat Load Operation shall

not constitute Process System Operation.

20

ttt.   "Project Dollars" shall mean Defendant's expenditures and payments incurred or made in carrying out the Environmental Mitigation Projects identified in Section V and Appendix A (Environmental Mitigation Projects) of this Consent Decree to the extent that such expenditures or payments both: (a) comply with the requirements set forth in Section V (Environmental Mitigation) and Appendix A of this Consent Decree, and (b) constitute Defendant's direct payments for such projects, or Defendant's external costs for Contractors, vendors, and equipment. Defendant shall not include its own personnel costs in overseeing the implementation of the Projects as Project Dollars.

uuu.   "PSD" shall mean the Prevention of Significant Deterioration program within the meaning of Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7492, 40 C.F.R. Part 52, and any applicable State Implementation Plan.

vvv.   "Refinery" shall mean the oil production refinery with whom Defendant contracts to provide steam and receive return water in order to operate the Low $NO_x$ Combustion System at Sunray.

www.   "Section" shall mean a portion of this Decree identified by a capitalized Roman numeral.

xxx.   "Selective Catalytic Reduction System" or "SCR" shall mean a pollution control system that employs anhydrous, aqueous ammonia or urea reagent injection and a catalyst to speed the reaction of the reagent with $NO_x$ and

to drive the reaction to greater completion, for the purpose of reducing $NO_x$ emissions.

yyy.  "Shutdown" shall mean the period of ceasing of operation at a Facility for any purpose, and shall be limited to an operational mode in which no oil and only natural gas and combustion air are supplied to the reactor.

zzz.  "$SO_2$" shall mean the pollutant sulfur dioxide, measured in accordance with the provisions of this Consent Decree.

aaaa.  "Startup" shall mean the period of setting in operation at a Facility for any purpose, and shall be limited to an operational mode in which no oil and only natural gas and combustion air are supplied to the reactor.

bbbb.  "Steam Custody Transfer Meter" shall mean the meter that shall continuously monitor the steam produced by the Low NOx Combustion System at Sunray and transferred to the Refinery under contract between the Refinery and the Defendant.  The Steam Custody Transfer Meter shall be capable of producing reports documenting steam transfers, including any reductions in steam demanded by the Refinery of 25% or more below the Contracted for Amount of Steam.

cccc.  "Sunray" shall mean Defendant's carbon black facility located at

> 11702 Carbon Black Road
> Sunray, TX 79086

dddd.  "Sunray Non-Assisted Flares" shall mean the Non-Assisted Flares at Sunray.

22

eeee.    "Sunray NOx Cap" shall mean the cap on NOx emissions at Sunray specified in Paragraph 30.

ffff.    "Sunray Unit 3 Pneumatic Loop Filter" shall mean a high efficiency fabric filtration unit which separates carbon black from the air stream and routes the carbon black to grinders and pelletizers.

gggg.    "Surplus Emission Reductions" shall mean reductions in an Emission Limit, 30-day Rolling Average Sulfur Content Weight Percent, and/or 365-day Rolling Average Sulfur Content Weight Percent over and above those required to comply with the requirements of this Consent Decree, to the extent that such reduced Emission Limit, 30-day Rolling Average Sulfur Content Weight Percent, and/or 365-day Rolling Average Sulfur Content Weight Percent is reflected in a federally enforceable emissions limit or requirement, which reductions may or may not take the form of credits that can be transferred to another entity, and is more stringent than the corresponding Emission Limit, 30-day Rolling Average Sulfur Content Weight Percent, and/or 365-day Rolling Average Sulfur Content Weight Percent imposed under this Consent Decree.

hhhh.    "Tail Gas" shall mean the gaseous by-product of the carbon black process, which is generated during periods when there is oil feed to a reactor burner.

iiii.    "Title V permit" shall mean a permit required by and issued in accordance with the requirements of 42 U.S.C. §§ 7661 - 7661f;

23

jjjj.   "United States" shall mean the United States of America, acting on behalf of EPA.

kkkk.  "Unplanned Steam Reduction Or Outage At The Refinery" shall mean an unplanned reduction or outage (where "unplanned" is a reduction or outage for which the Refinery provides less than 14 days' notice to Defendant) when the Refinery temporarily reduces or ceases operations such that it reduces the demand by the Refinery for steam from Sunray by 25% or more below the Contracted for Amount of Steam or reduces the return water provided by the Refinery to Sunray by 25% or more below the Contracted For Amount of Boiler Water.  The reduction in the steam demanded by the Refinery from Sunray shall be measured and documented by the Steam Custody Transfer Meter.  The reduction in boiler water provided to Sunray by the Refinery shall be measured and documented by the Boiler Water Custody Transfer Meter.  For purposes of Section IX (Prohibition on Use of Sunray Non-Assisted Flares) of this Decree, the total time allowed for an Unplanned Steam Reduction or Outage in any single Calendar Year (of January 1 through December 31) shall not exceed 120 hours in duration.  If there is no Contracted For Amount Of Steam or Contracted For Amount of Boiler Water because there is no related contract between the Defendant and the Refinery, there shall be no Unplanned Steam Reduction Or Outage At The Refinery.

24

llll.   "Wet Gas Scrubber" and "WGS" shall mean a pollution control device

that removes $SO_2$ and PM from flue gas through contact with a caustic

scrubbing liquid.

### IV.  CIVIL PENALTY

9.      Within 30 Days after the Effective Date of this Consent Decree, Defendant shall pay to the United States a civil penalty of $455,000.  Failure to timely pay the civil penalty shall subject Defendant to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render Defendant liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.   Defendant shall make the above referenced payment by FedWire Electronic Funds Transfer ("EFT" or wire transfer) to the United States Department of Justice account in accordance with current electronic funds transfer procedures, referencing U.S.A.O. file number 2015V00169 and DOJ Case No. 90-5-2-1-09729.  Payment shall be made in accordance with instructions provided to Defendant by the Financial Litigation Unit of the United States Attorney's Office for the Western District of Oklahoma. Any payments received by the Department of Justice after 4:00 P.M. (Central Time) will be credited on the next Business Day.  At the time of payment, Defendant shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States, et al. v. Defendant Continental Carbon Company*, and shall reference the civil action number and DOJ case number 90-5-2-1-09729, to the United States in accordance with Section XXI (Notices); by email to acctsreceivable.CINWD@epa.gov; and to:

25

EPA Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

10.     Within 30 Days after the Effective Date of this Consent Decree, Defendant shall pay to the ODEQ a civil penalty of $97,500 and to the State of Alabama a civil penalty of $97,500.  If any portion of the civil penalty due to the State is not paid when due, Defendant shall pay interest on the amount past due, accruing from the Effective Date through the date of payment at the rate identified in Paragraph 9 above, by certified check made payable to, for ODEQ, the Oklahoma Department of Environmental Quality Penalty Fund, Oklahoma DEQ, Accounts Receivable, Financial and Human Resources Management, Department of Environmental Quality, P.O. Box 2036, Oklahoma City, Oklahoma 73101-2036, and for the State of Alabama, Alabama Department of Environmental Management, Office of General Counsel, Post Office Box 301463, Montgomery, Alabama 36130-1463, or by EFT to the State of Oklahoma and/or the State of Alabama in accordance with written instructions to be provided to Defendant upon request.

11.     Defendant shall not deduct any penalties paid under this Section or Section XIV (Stipulated Penalties) in calculating its federal or state or local income tax.

## V.  ENVIRONMENTAL MITIGATION

12.     Defendant shall implement the Environmental Mitigation Projects described in Appendix A of this Consent Decree, in compliance with any approved plans and schedules for such Environmental Mitigation Projects and the other terms of this Consent Decree.  In implementing the Environmental Mitigation Projects, Defendant shall spend no less than a total of $550,000 in Project Dollars, in the aggregate, for all Environmental Mitigation Projects.

26

13.     All plans and reports prepared by Defendant pursuant to the requirements of this Section of the Consent Decree and required to be submitted to EPA and the applicable Plaintiff-Intervenor shall be publicly available (subject to the provisions of Paragraph 94 of this Consent Decree) from Defendant without charge.

14.     If Defendant elects (where such an election is allowed) to contribute funds to another person or entity that will carry out the Environmental Mitigation Projects in lieu of Defendant, but not including Defendant's agents or Contractors, that person or instrumentality must, in writing:  (a) identify its legal authority for accepting such funding and (b) identify its legal authority to conduct the Environmental Mitigation Projects for which Defendant contributes the funds.  Regardless of whether Defendant elects (where such election is allowed) to undertake Environmental Mitigation Projects by itself or to do so by contributing funds to another person or instrumentality that will carry out the Environmental Mitigation Projects, Defendant acknowledges that it will receive credit for the expenditure of such funds as Project Dollars only if Defendant demonstrates that the funds have been actually spent by either Defendant or by the person or instrumentality receiving them, and that such expenditures met all requirements of this Consent Decree.

15.     Defendant shall certify, as part of each plan submitted to EPA and the applicable Plaintiff-Intervenor for any Environmental Mitigation Project or within 30 Days before the start of any Environmental Mitigation Project, whichever occurs first, that Defendant is not otherwise required by law to perform the Environmental Mitigation Projects, that Defendant is unaware of any other person who is required by law to perform the Environmental Mitigation Projects, and that Defendant will not use any Environmental Mitigation Projects, or portion thereof, to satisfy any obligations that it may have under other applicable requirements of law.

16.     Defendant shall maintain, and upon Plaintiffs' request, provide to Plaintiffs within 60 Days of such request, all documents that substantiate the work completed on the Environmental Mitigation Projects or the Project Dollars expended to implement the Environmental Mitigation Projects in accordance with Sections XXI (Notices) and XVIII (Information Collection and Retention).

## VI.  SO₂ CONTROL TECHNOLOGY, EMISSIONS LIMITS, AND MONITORING REQUIREMENTS

17.     <u>SO₂ Process System Operation Emissions Limits and Control Technology</u>.  No later than the dates set forth in the table below, Defendant shall install, and continuing thereafter, Defendant shall Continuously Operate, a DGS or WGS on each Process System specified in the table below so as to achieve and maintain during Process System Operation the Emissions Limits specified in the table below:

| Process System | Control Technology | 7-day Rolling Average Emissions Limit | 365-day Rolling Average Emissions Limit | Date of Continuous Operation |
|---|---|---|---|---|
| Ponca Process System[1] | DGS or WGS | Interim 7-day Rolling Average Emissions Limit:<br><br>No greater than 158 ppmvd (at 0% oxygen) | Interim 365-day Rolling Average Emissions Limit:<br><br>No greater than 130 ppmvd (at 0% oxygen) | Applicable interim Emissions Limit: 9/30/18 |
| | | Final 7-day Rolling Average Emissions Limit:<br><br>Option A: No greater than 120 ppmvd (at | Final 365-day Rolling Average Emissions Limit:<br><br>Option A: No greater than 80 ppmvd (at 0% | Applicable final Emissions Limit: Pursuant to the protocol specified in Appendix E |

---

[1]     If Defendant elects to install two DGSs or two WGSs at Ponca, then for purposes of compliance with this Paragraph 17, there shall be two Process Systems at Ponca, each of which shall individually meet the Emissions Limits in the table in Paragraph 17.

28

| Process System | Control Technology | 7-day Rolling Average Emissions Limit | 365-day Rolling Average Emissions Limit | Date of Continuous Operation |
|---|---|---|---|---|
| | | 0% oxygen)<br><br>Option B: No less than 120 ppmvd (at 0% oxygen) and no greater than 158 ppmvd (at 0% oxygen) | oxygen)<br><br>Option B: No less than 80 ppmvd (at 0% oxygen) and no greater than 130 ppmvd (at 0% oxygen) | |
| Phenix Process System | DGS or WGS | Interim 7-day Rolling Average Emissions Limit:<br><br>No greater than 158 ppmvd (at 0% oxygen) | Interim 365-day Rolling Average Emissions Limit:<br><br>No greater than 130 ppmvd (at 0% oxygen) | Applicable interim Emissions Limit: 6/30/21 |
| | | Final 7-day Rolling Average Emissions Limit:<br><br>Option A: No greater than 120 ppmvd (at 0% oxygen)<br><br>Option B: No less than 120 ppmvd (at 0% oxygen) and no greater than 158 ppmvd (at 0% oxygen) | Final 365-day Rolling Average Emissions Limit:<br><br>Option A: No greater than 80 ppmvd (at 0% oxygen)<br><br>Option B: No less than 80 ppmvd (at 0% oxygen) and no greater than 130 ppmvd (at 0% oxygen) | Applicable final Emissions Limit: Pursuant to the protocol specified in Appendix E |

18.    DGS or WGS Design Specifications.  Defendant shall submit to EPA the process design specifications for each DGS or WGS specified in the table above no later than 12 months prior to the start of installation of the DGS or WGS at Ponca and 24 months prior to the start of installation of the DGS or WGS at Phenix.  Defendant shall design each DGS or WGS specified in Paragraph 17 to achieve a minimum of 95% removal of $SO_2$ emissions at all times at the applicable Process System based on inlet $SO_2$ concentration of 1280 ppmvd to 3900 ppmvd (at

29

0% oxygen). In addition, if Defendant elects to comply with the applicable Emissions Limit pursuant to Option B, the Parties shall follow the protocol specified in Appendix E.

19. $SO_2$ Alternative Equivalent Pollution Control Technology. Alternatively, notwithstanding any provision of this Consent Decree to the contrary, no later than the applicable dates set forth in Paragraph 17, Defendant may install, and continuing thereafter shall Continuously Operate, an Alternative Equivalent Pollution Control Technology that is at least as effective as a DGS or WGS, so as to achieve and maintain the applicable Emissions Limits specified in Paragraph 17, provided there has been prior written request, no later than the applicable date set forth in Paragraph 18, and written approval of such Alternative Equivalent Pollution Control Technology pursuant to Section XII (Review and Approval of Submittals) of this Consent Decree.

20. $SO_2$ Monitoring Requirements. Beginning no later than the dates specified in the table in Paragraph 17, Defendant shall use a CEMS (in accordance with the terms of this Paragraph) to monitor $SO_2$ emissions during Process System Operation of each Process System specified therein and to report compliance with the terms and conditions of $SO_2$ Emission Limits in Paragraph 17 this Consent Decree. Defendant shall install, calibrate, certify, maintain and operate all CEMS in accordance with the equipment manufacturer's specifications and reference methods specified in 40 C.F.R. § 60.13 that are applicable to CEMS, and Part 60, Appendixes A and F, and the applicable performance specification test of 40 C.F.R. Part 60, Appendix B, to demonstrate compliance with the $SO_2$ Emissions Limits specified in Paragraph 17 of this Consent Decree.

21. Other $SO_2$ Requirements. No later than the dates set forth in the table below, and continuing thereafter, at all times of Process System Operation at Sunray, Defendant shall

30

process carbon black feedstock with a sulfur content of no greater than the weight specified in the table below:

| Process System | 30-day Rolling Average Sulfur Content Weight Percent | 365-day Rolling Average Sulfur Content Weight Percent | Date |
|---|---|---|---|
| Sunray Process System | 1.75% | 1.5% | 9/30/15 |

22.    Feedstock Sulfur Content Monitoring Requirements.  Beginning no later than the dates specified in the table in Paragraph 21, Defendant shall demonstrate compliance with the 30-day Rolling Average Sulfur Content Weight Percent and the 365-day Rolling Average Sulfur Content Weight Percent in Paragraph 21 by either:

a.    at least once per calendar week, analyzing the sulfur content of the feedstock in each receiving tank on a weight % basis and the liquid density in pounds per gallon (lb/gallon), or

b.    within one Business Day of each feedstock delivery, calculating the feedstock sulfur content of each receiving tank, through the following equation:

$$S_T = \frac{VS\rho + V_1 S_1 \rho_1}{V\rho + V_1 \rho_1}$$

Where:

$S_T$ = Tank-specific feedstock sulfur content, after the delivery of feedstock into the tank, weight %

$V$ = Volume of the feedstock in the tank, prior to the delivery of feedstock into the tank, gallons

$S$ = Sulfur content of the feedstock in the tank, prior to the delivery of feedstock into the tank, weight %

31

$\rho$ = Liquid density of the feedstock in the tank, prior to the delivery of feedstock into the tank, lb/gallon

$V_I$ = Volume of feedstock delivered into the tank, gallons

$S_I$ = Sulfur content of the feedstock delivered into the tank as certified by the feedstock supplier, weight %

$\rho_I$ = Liquid density of the feedstock delivered into the tank as certified by the feedstock supplier, lb/gallon

## VII.  NO$_x$ CONTROL TECHNOLOGY, EMISSIONS LIMITS, AND MONITORING REQUIREMENTS

23.     NO$_x$ Emissions Limits Applicable to Heat Load Operation, Startup, and Shutdown.  No later than the dates set forth in the table below, and continuing thereafter, Defendant shall operate the reactors and boilers at each Facility to collectively achieve and maintain the Emissions Limits specified in the table below, at all times, collectively, of Heat Load Operation, Startup, and Shutdown:

| Facility | 365-day Rolling Sum Emissions Limit | Date of Continuous Operation |
|---|---|---|
| Ponca | No greater than 50 tons (in total for all reactors and boilers) for the prior 365 Days | 9/30/18 |
| Phenix | No greater than 50 tons (in total for all reactors and boilers) for the prior 365 Days | 6/30/21 |
| Sunray | No greater than 50 tons (in total for all reactors and boilers) for the prior 365 Days | 9/30/18 |

24.     Heat Load Operation, Startup, and Shutdown Compliance Calculation.  Beginning no later than the dates specified in the table in Paragraph 23, and continuing thereafter, to evaluate compliance with the applicable 365-day Rolling Sum Emissions Limit specified in Paragraph 23, Defendant shall perform the following calculation, for each Day, summing as described, to derive cumulative NO$_x$ emissions in tons:

$$X = \left( \sum_{i=1}^{365} \left[ \frac{\varphi * consumption_i}{2000\ lbs} \right] \right)$$

Where:

"X" = cumulative $NO_x$ emissions (tons) during preceding 365 Days

"$\varphi$" = 0.48 lbs $NO_x$/MMBtu

"i" = each Day in the preceding 365 Days

$consumption_i$ = the amount of energy input from natural gas and feedstock (in MMBtu) to the Process System per Day for each Day $i$ of Heat Load Operation, Startup, or Shutdown. For any Day in which no Heat Load Operation, Startup, or Shutdown occur, $consumption_i$ shall equal zero.

25.    Alternative Heat Load Operation, Startup, and Shutdown Compliance Calculation. As an alternative to the calculation in Paragraph 24, beginning no later than the dates specified in the table in Paragraph 23, and continuing thereafter, to evaluate compliance with the applicable 365-day Rolling Sum Emissions Limit specified in Paragraph 23, Defendant may perform an alternative calculation, for each Day, to derive daily $NO_x$ emissions in tons as a sum for the prior 365 Days, provided there has been prior written request, which specifies the basis for the derivation of such alternative calculation no later than 24 Months from the Effective Date of the Consent Decree, and written approval of such alternative calculation pursuant to Section XII (Review and Approval of Submittals) of this Consent Decree.

26.    $NO_x$ Process System Operation Emissions Limits and Control Technology. No later than the dates set forth in the table below, Defendant shall install, and continuing thereafter, Defendant shall Continuously Operate, the designated Control Technology on each Process System specified in the table below so as to achieve and maintain during Process System Operation the Emissions Limits specified in the table below:

33

| Process System | Control Technology | 7-day Rolling Average Emissions Limit | 365-day Rolling Average Emissions Limit | Date of Continuous Operation |
|---|---|---|---|---|
| Ponca Process System[2] | SCR | No greater than 54 ppmvd (at 0% oxygen) | No greater than 38 ppmvd (at 0% oxygen) | 9/30/18 |
| Phenix Process System | SCR | No greater than 54 ppmvd (at 0% oxygen) | No greater than 38 ppmvd (at 0% oxygen) | 6/30/21 |
| Sunray Process System | Low-$NO_x$ Combustion System | Interim 7-day Rolling Average Emissions Limit:<br><br>No greater than 375 ppmvd (at 0% oxygen) | Interim 365-day Rolling Average Emissions Limit:<br><br>No greater than 300 ppmvd (at 0% oxygen) | Applicable interim Emissions Limit: 9/30/18 |
| | | Final 7-day Rolling Average Emissions Limit:<br><br>Option A: No greater than 120 ppmvd (at 0% oxygen)<br><br>Option B: No less than 120 ppmvd (at 0% oxygen) and no greater than 375 ppmvd (at 0% oxygen) | Final 365-day Rolling Average Emissions Limit:<br><br>Option A: No greater than 80 ppmvd (at 0% oxygen)<br><br>Option B: No less than 80 ppmvd (at 0% oxygen) and no greater than 300 ppmvd (at 0% oxygen) | Applicable final Emissions Limit: Pursuant to the protocol specified in Appendix F |

27.    <u>SCR and Low-$NO_x$ Combustion System Design Specifications</u>.  Defendant shall

submit to EPA the process design specifications for each Control Technology specified in the

---

[2]   If Defendant elects to install two SCRs at Ponca, then for purposes of compliance with this Paragraph 26, there shall be two Process Systems at Ponca, each of which shall individually meet the Emissions Limits in the table in Paragraph 26.

table above no later than 12 months prior to the start of installation of the specified Control Technology at Ponca and Sunray and 24 Months prior to the start of installation of the pertinent Control Technology at Phenix.  If Defendant elects to comply with the applicable Emissions Limit for the Low $NO_x$ Combustion System pursuant to Option B, the Parties shall follow the protocol specified in Appendix F.

28.     $NO_x$ Alternative Equivalent Pollution Control Technology.  Alternatively, notwithstanding any provision of this Consent Decree to the contrary, no later than the applicable dates set forth in Paragraph 26, Defendant may install, and continuing thereafter shall Continuously Operate, an Alternative Equivalent Pollution Control Technology that is at least as effective as a SCR (Ponca and Phenix), so as to achieve and maintain the applicable Emissions Limits specified in Paragraph 26, provided there has been prior written request, no later than the applicable date set forth in Paragraph 27, and written approval of such Alternative Equivalent Pollution Control Technology pursuant to Section XII (Review and Approval of Submittals) of this Consent Decree.

29.     $NO_x$ Monitoring Requirements.  Beginning no later than the dates specified in the table in Paragraph 26, Defendant shall use a CEMS (in accordance with the terms of this Paragraph) to monitor $NO_x$ emissions during Process System Operation of each Process System specified therein and to report compliance with the terms and conditions of the $NO_x$ Emission Limits (Paragraph 26) of this Consent Decree.  Defendant shall install, calibrate, certify, maintain, and operate all CEMS in accordance with the equipment manufacturer's specifications and reference methods specified in 40 C.F.R. § 60.13 that are applicable to CEMS, and Part 60, Appendixes A and F, and the applicable performance specification test of 40 C.F.R. Part 60,

Appendix B, to demonstrate compliance with the $NO_x$ Emissions Limits specified in Paragraph 26 of this Consent Decree.

30.    <u>Sunray NOx Cap</u>.  Defendant shall comply with a Sunray $NO_x$ Cap of 465 tons per Calendar Year by September 30, 2019 (i.e., the first day included in the first Calendar Year is October 1, 2018).  For purposes of determining compliance with the Sunray $NO_x$ Cap, $NO_x$ emissions shall be determined for (a) the Low $NO_x$ Combustion System, by measuring emissions using a CEMS in accordance with Paragraph 29 and (b) for the remainder of the Sunray facility, by calculating emissions using the following:  (i) For all Dryer Exhaust Bag Filters combined: $NO_x$ Emissions = Three x ($NO_x$ factor for Dryer Exhaust Bag Filters) x (actual Calendar Year production lbs/210,000,000 current permitted lbs), where the $NO_x$ factor for Dryer Exhaust Bag Filters = 84.9 tons per year; (ii) For the dryer drum stack :  $NO_x$ emissions = ($NO_x$ factor for dryer drum stack ) x (actual Calendar Year production lbs/210,000,000 current permitted lbs), where the $NO_x$ factor for dryer drum stack = 28.3 tons per year; and (iii) For the Sunray Non-Assisted Flares:  $NO_x$ Emissions = ($NO_x$ factor for Sunray Non-Assisted Flare) x (actual production lbs while Sunray Non-Assisted Flare is operating/210,000,000 current permitted lbs), where the $NO_x$ factor for Sunray Non-Assisted Flare #1 = 121 tons per year and Sunray Non-Assisted Flare #2 = 84.9 tons per year.  Defendant may seek to revise either the $NO_x$ factor for Dryer Exhaust Bag Filters or the $NO_x$ factor for the dryer drum stack, based on additional stack test data, provided there has been a prior written request by Defendant, which specifies the basis for the derivation of such revised factor, and written approval by EPA of such revised factor pursuant to Section XII (Review and Approval of Submittals) of this Consent Decree.

## VIII.  PM CONTROL TECHNOLOGY, EMISSIONS LIMITS, BEST MANAGEMENT PRACTICES, AND EARLY WARNING SYSTEM REQUIREMENTS

31.      PM Control Technology and Emissions Limits.  No later than the dates set forth in the table below, Defendant shall install, and continuing thereafter, Defendant shall Continuously Operate, a DGS or WGS on each Process System specified in the table below so as to achieve and maintain the Emissions Limits specified in the table below:

| Process System | Control Technology | 3-hour Average Emissions Limit for PM | Date of Continuous Operation |
|---|---|---|---|
| Ponca Process System | DGS or WGS | No greater than 0.0069 gr/dscf | 3/31/19 |
| Phenix Process System | DGS or WGS | No greater than 0.0069 gr/dscf | 12/30/21 |

32.      PM Stack Testing Requirements.  Beginning no later than the dates specified in the table in Paragraph 31, and continuing annually thereafter, Defendant shall conduct a stack test for PM for each Process System specified therein to report compliance with the terms and conditions of this Consent Decree.  No two annual tests shall be conducted less than 11 Months apart.  The reference methods and procedures for performing PM stack tests and for determining compliance with the applicable PM 3-hour Average Emissions Limit shall be those specified in 40 C.F.R. § 60.8(f) and 40 C.F.R. Part 60, Appendix A-3, Reference Method 5/5B.  Each test shall consist of three separate runs performed under representative operating conditions, not including periods of Startup, Shutdown, or Malfunction.  The sampling time for each run shall be at least sixty (60) minutes and the minimum sample volume of each run shall be 30 ft$^3$ (dry volume, standard temperature basis).

37

33.    <u>Other PM Control Requirements.</u>  For all PM Emissions Equipment identified in Appendix B to this Consent Decree, Defendant shall Continuously Operate the associated PM Reduction Mechanism in accordance with the Method for Managing PM Emissions identified therein.  Starting no later than 60 Days after the Effective Date of this Consent Decree, once each Operating Day, Defendant shall conduct a Method 22 visual assessment of the emissions from each piece of PM Emissions Equipment identified in Appendix B to this Consent Decree to determine if there are any detectable visible emissions.  In the event that any visible emissions are observed from PM Emissions Equipment during the visual assessment described in this Paragraph, Defendant shall identify, address and resolve the source of visible emissions as expeditiously as practicable.  If the visible emissions event occurs after the date of Continuous Operation of the PM Early Warning System in accordance with Paragraph 35 of this Consent Decree, the event shall be considered resolved once the PM Early Warning System alarm is below the Action Level.  If the visible emissions event is not resolved within 24 hours, once visibility conditions are sufficient for a Method 9 observation, Defendant shall conduct a six minute observation in accordance with Method 9 at least once every eight hours (during daylight hours), until visible emissions from the PM Emissions Equipment that triggered the event are less than 5% over the six minute average. Defendant shall maintain a record of each visual assessment conducted pursuant to this Paragraph sufficient to meet the requirements in Section XIII (Recordkeeping and Reporting Requirements).

34.    <u>Particulate Emissions Best Management Practices Control Plan.</u>  Within 60 Days of the Effective Date of this Consent Decree, Defendant shall implement the Particulate Emissions Best Management Practices Control Plan reflected in Appendix C at each of its Facilities.

38

35.     PM Early Warning System.  No later than the dates set forth in the table below, Defendant shall install, and continuing thereafter, Defendant shall Continuously Operate, a PM Early Warning System in accordance with the protocol specified in Appendix D:

| Process System | Date of Continuous Operation |
|---|---|
| Sunray Process System | 3/31/16 |
| Ponca Process System | 7/1/15 |
| Phenix Process System | 7/1/15 |

## IX.  PROHIBITION ON USE OF SUNRAY NON-ASSISTED FLARES

36.     Prohibition On Use Of Sunray Non-Assisted Flares. No later than the date set forth in the table below, Defendant shall permanently cease operation of the Sunray Non-Assisted Flares, except in the limited instance of (a) a Malfunction at Sunray that satisfies the requirements of Section XVI (Affirmative Defenses To Certain Stipulated Penalties), (b) an Unplanned Steam Reduction Or Outage At The Refinery that satisfies the requirements of Paragraphs 77 (except the requirements of 77.a., 77.b. and 77.d.) and 78 of this Consent Decree, (c) Inspection at the Low NOx Combustion System at Sunray, or (d) Force Majeure that satisfies the requirements of Section XV (Force Majeure).  In response to any of these of instances, Defendant shall operate the Sunray Non-Assisted Flares only as necessary to comply with the carbon black MACT standard (40 C.F.R. § 63.1103(f)), minimize operation of the Sunray Non-Assisted Flares to the extent possible, and operate the Sunray Non-Assisted Flares in accordance with the requirements in Paragraph 37 of this Consent Decree.

| Facility | Date |
|---|---|
| Sunray | 9/30/18 |

37.    Limited Operation of the Sunray Non-Assisted Flares.  Defendant shall comply with applicable law at all times the Sunray Non-Assisted Flares are in operation.

38.    Prohibition on Use of Flares at Ponca and Phenix. Prior to termination of this Consent Decree, Defendant shall not operate any Flares at Ponca and Phenix.

## X.  PROHIBITION ON NETTING CREDITS OR OFFSETS

39.    Defendant shall neither generate nor use any CD Emissions Reductions:  as netting reductions; as emissions offsets; to apply for, obtain, trade, or sell any emission reduction credits; or in determining whether a project would result in a significant emissions increase or significant net emissions increase in any PSD, Non-Attainment NSR, and/or minor New Source Review permit or permit proceeding.  Notwithstanding the preceding sentence, Defendant may use CD Emissions Reductions achieved by the prohibition on use of the Sunray Non-Assisted Flares required in Paragraph 36 of this Consent Decree for the limited purpose of permitting of the Low NOx Combustion System at Sunray.

40.    The limitations set forth in Paragraph 39 above do not prohibit Defendant from seeking to, nor prohibit an applicable state agency from denying Defendant's ability to, generate or use Surplus Emission Reductions.

41.    Nothing in this Section is intended to prohibit Defendant from seeking to, nor to prohibit an applicable state agency from denying, Defendant's ability to use CD Emissions Reductions for compliance with any rules or regulations designed to address regional haze or the non-attainment status of any area (excluding PSD and Non-Attainment NSR rules, but including, for example, Reasonably Achievable Control Technology rules) that apply to the facility; provided, however, that Defendant shall not be allowed to trade or sell any CD Emissions Reductions.  Nothing in this Consent Decree is intended to preclude the CD Emissions

40

Reductions from being considered by a State or EPA for the purpose of attainment demonstrations submitted pursuant to Section 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on NAAQS, PSD increment, or air quality related values, including visibility, in a Class I area.

### XI.  PERMITS

42.    Where any compliance obligation under this Consent Decree requires Defendant to obtain a federal, state, or local permit or approval, Defendant shall submit a timely and complete application for each such permit or approval and take all other actions necessary to obtain all such permits or approvals, allowing for all legally required processing and review, including requests for additional information by the permitting or approval authority necessary to process a permit application to satisfy the compliance obligations established by this Decree. Defendant may seek relief under the provisions of Section XV (Force Majeure) for any delay in the performance of any obligation under this Consent Decree resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, only if Defendant has (a) submitted timely and complete applications in a manner that provides the permitting authority sufficient and reasonable time to process the permit application, (b) responded to requests for additional information by the permitting authority necessary to process the application to satisfy the compliance obligations established by this Decree, (c) taken all other actions necessary to obtain such permits or approvals for the compliance obligations established by this Decree in a timely fashion, and (d) prosecuted appeals of any allegedly unlawful, invalid or otherwise objectionable terms and conditions, if any, imposed by the permitting authority in a timely fashion.  Each Plaintiff-Intervenor agrees to work cooperatively

41

with Defendant in reviewing all applications for permits necessary to comply with the requirements of this Consent Decree.

43.    In addition to having first obtained any required preconstruction permits or other approvals pursuant to Paragraph 42 above, Defendant, within 12 Months from commencement of operation of each Control Technology or Flare installed, upgraded, and/or operated under this Consent Decree, shall apply to permanently include the requirements and limitations enumerated in this Paragraph into (i) a federally-enforceable permit (other than a Title V operating permit) or request a site-specific amendment to the applicable SIP, such that the requirements and limitations enumerated in this Paragraph become and remain 'applicable requirements' as that term is defined in 40 C.F.R. Part 70.2 and these requirements shall survive the termination of this Consent Decree in accordance with Section XXVII (Termination) in the form of a federally-enforceable permit (other than a Title V operating permit) or a site-specific amendment to the applicable SIP or (ii) for the consolidated Title V construction and operating permit program in each of the states of Alabama (for Phenix), Oklahoma (for Ponca), and Texas (for Sunray), into a consolidated permit, such that the requirements and limitations enumerated in this Paragraph become and remain 'applicable requirements' as that term is defined in 40 C.F.R. Part 70.2 and shall survive the termination of this Consent Decree in accordance with Section XXVII (Termination).  The permit, approval or SIP amendment shall require compliance with the following requirements of this Consent Decree: any applicable (a) 7-day Rolling Average Emissions Limit for $SO_2$ or $NO_x$, (b) 365-day Rolling Average Emissions Limit for $SO_2$ or $NO_x$, (c) 365-day Rolling Sum Emissions Limit, (d) 30-day Rolling Average Sulfur Content Weight Percent, (e) 365-day Rolling Average Sulfur Content Weight Percent, (f) PM Control Technology, Emissions Limits, Best Management Practices, and Early Warning System

42

Requirements required by Section VIII, (g) Sunray $NO_x$ Cap, and (h) requirements specified in Paragraphs 20 ($SO_2$ Monitoring Requirements), 22 (Feedstock Sulfur Content Monitoring Requirements), 29 ($NO_x$ Monitoring Requirements), and 37 (Limited Operation of the Sunray Non-Assisted Flares).  Following submission of an application for any permit or approval, Defendant shall cooperate with the appropriate permitting authority by promptly submitting the information that such permitting authority seeks that is necessary for incorporating the preceding list of requirements into a permit following its receipt of the application for the permit. Defendant agrees not to contest the submittal to EPA of any such proposed SIP revision that incorporates the requirements listed in this Paragraph 43 of this Consent Decree, or EPA's approval of such submittal, or the incorporation of the requirements listed in this Paragraph 43 of this Consent Decree through these SIP requirements into Title V permits.

44.     Unless Defendant has already complied with the requirement to include the provisions listed in Paragraph 43(ii) in a permit through its Title V permit, upon issuance of a permit, approval or SIP amendment pursuant to the terms of Paragraph 43 of this Section, or in conjunction with the issuance of such permit, approval or SIP amendment, Defendant shall file any applications necessary to incorporate the requirements of the permit into the Title V operating permit for the relevant Facility.  Defendant shall not challenge the inclusion in any such permit of the following terms, to the extent expressly imposed by this Consent Decree (a) 7-day Rolling Average Emissions Limit for $SO_2$ or $NO_x$, (b) 365-day Rolling Average Emissions Limit for $SO_2$ or $NO_x$, (c) 365-day Rolling Sum Emissions Limit, (d) 30-day Rolling Average Sulfur Content Weight Percent, (e) 365-day Rolling Average Sulfur Content Weight Percent, (f) PM Control Technology, Emissions Limits, Best Management Practices, and Early Warning System Requirements required by Section VIII, (g) Sunray $NO_x$ Cap, and (h) requirements

43

specified in Paragraphs 20 ($SO_2$ Monitoring Requirements), 22 (Feedstock Sulfur Content Monitoring Requirements), 29 ($NO_x$ Monitoring Requirements) , and 37 (Limited Operation of the Sunray Non-Assisted Flares).  Notwithstanding the foregoing, nothing in this Consent Decree is intended nor shall it be construed to require the establishment of Emissions Limits or limits on the sulfur content of carbon black feedstock other than those Emissions Limits, 30-day Rolling Average Sulfur Content Weight Percent, and/or 365-day Rolling Average Sulfur Content Weight Percent, expressly prescribed in this Consent Decree nor to preclude Defendant from challenging any more stringent Emissions Limits, 30-day Rolling Average Sulfur Content Weight Percent, and/or 365-day Rolling Average Sulfur Content Weight Percent, should they be proposed for or included in a Title V operating permit or any other permit necessary to implement any compliance obligations under this Decree.

45.    When permits or SIP amendments are required, Defendant shall complete and submit applications for such permits or SIP amendments to the appropriate authorities to allow sufficient time for all legally required processing and review of the permit application or application for a SIP amendment, including requests for additional information by the permitting authorities that are necessary to process an application for a permit to satisfy the compliance obligations established by this Decree.  Any failure by Defendant to submit a timely and complete permit application or application for a SIP amendment shall bar any use by Defendant of Section XV (Force Majeure), where a Force Majeure claim is based on permitting delays or delays associated with issuance of a SIP amendment.

46.    Defendant shall provide EPA with a copy of each application for a permit to address or comply with any provision of this Consent Decree, as well as a copy of any permit

44

proposed as a result of such application, to allow for timely participation in any public comment opportunity.

47.     Notwithstanding the reference to Title V permits in this Consent Decree, the enforcement of such permits shall be in accordance with their own terms and the Act and its implementing regulations.  Such Title V permits shall not be enforceable under this Consent Decree, although any term or limit established by or under this Consent Decree shall be enforceable under this Consent Decree regardless of whether such term or limit has or will become part of a Title V permit, subject to the terms of Section XXVII (Termination).

48.     Prior to Termination pursuant to the terms of Section XXVII (Termination), Defendant shall ensure that any enforceable requirements established under the Consent Decree are included in the applicable Title V permit including, but not limited to, any applicable (a) 7-day Rolling Average Emissions Limit for $SO_2$ or $NO_x$, (b) 365-day Rolling Average Emissions Limit for $SO_2$ or $NO_x$, (c) 365-day Rolling Sum Emissions Limit, (d) 30-day Rolling Average Sulfur Content Weight Percent, (e) 365-day Rolling Average Sulfur Content Weight Percent, (f) PM Control Technology, Emissions Limits, Best Management Practices, and Early Warning System Requirements required by Section VIII, (g) Sunray $NO_x$ Cap, and (h) requirements specified in Paragraphs 20 ($SO_2$ Monitoring Requirements), 22 (Feedstock Sulfur Content Monitoring Requirements), 29 ($NO_x$ Monitoring Requirements), and 37 (Limited Operation of the Sunray Non-Assisted Flares).

## XII.  REVIEW AND APPROVAL OF SUBMITTALS

49.     Defendant shall submit each plan, report, or other submission required by this Consent Decree to the EPA and, as applicable, to Plaintiff-Intervenor(s), whenever such a document is required to be submitted for review or approval pursuant to this Consent Decree.

Whenever approval of such document is required pursuant to this Consent Decree, EPA, after consultation with Plaintiff-Intervenor(s), as applicable, shall in writing: a) approve the submission; b) approve the submission upon specified conditions; c) approve part of the submission and disapprove the remainder; or d) disapprove the submission, identifying the reasons for such disapproval.

50.     If the submission is approved pursuant to Paragraph 49.a, Defendant shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.  If the submission is conditionally approved or approved only in part, pursuant to Paragraph 49.b or .c, Defendant shall, upon written direction from EPA after consultation with Plaintiff-Intervenors, take all actions required by the approved plan, report, or other item that EPA determines are technically severable from any disapproved portions, subject to Defendant's right to dispute only the specified conditions or the disapproved portions, under Section XVII of this Decree (Dispute Resolution)

51.     If the submission is disapproved in whole or in part pursuant to Paragraph 49.c or .d, Defendant shall, within 45 Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.  If the resubmission is approved in whole or in part, Defendant shall proceed in accordance with the preceding Paragraph.  Any stipulated penalties applicable to the original submission, as provided in Section XIV (Stipulated Penalties) of this Decree, shall accrue during the 45 Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant's

46

obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

52.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA after consultation with Plaintiff-Intervenors may again require Defendant to correct any deficiencies, in accordance with the preceding Paragraphs, or may itself correct any deficiencies, subject to Defendant's right to invoke Dispute Resolution and the right of EPA and Plaintiff-Intervenors to seek stipulated penalties as provided in the preceding Paragraphs.

## XIII.  RECORDKEEPING AND REPORTING REQUIREMENTS

53.     Within 30 Days after the end of each half calendar year (i.e., by January 30th and July 30th) after the Effective Date, until termination of this Decree pursuant to Section XXVII (Termination), Defendant shall submit a semi-annual report to EPA and Plaintiff-Intervenors for the immediately preceding half calendar year period that shall contain the information described in this Paragraph 53 (a)-(j) for such immediately preceding half calendar year period:

   a.     A description of the progress of the construction of the Control Technologies, CEMS, and PM Early Warning Systems required by this Consent Decree, including:

      i.     if construction is not underway, any available information concerning the construction schedule and the execution of major contracts;

      ii.     if construction is underway, the estimated percent of installation as of the end of the reporting period, the current estimated construction completion date, and a brief description of completion of significant milestones during the reporting period;

iii.  any information indicating that installation and commencement of operation may be delayed, including the nature and cause of the delay, and any steps taken by Defendant to mitigate such delay;

iv.  once construction is complete, the dates the equipment was placed in service and/or commenced Continuous Operation and the dates of any testing that was performed during the period;

b.  All information necessary to demonstrate compliance with all applicable Emissions Limits, Sunray $NO_x$ Cap, 30-day Rolling Average Sulfur Content Weight Percent, 365-day Rolling Average Sulfur Content Weight Percent, and other provisions in Sections VI ($SO_2$ Control Technology, Emissions Limits, and Monitoring Requirements), VII ($NO_x$ Control Technology, Emissions Limits, and Monitoring Requirements), VIII (PM Control Technology, Emissions Limits, Best Management Practices, and Early Warning System Requirements), and Section IX (Prohibition on Use of Flares);

c.  All data collected for each Sunray Process System, from the time any 30-day Rolling Average Sulfur Content Weight Percent and/or 365-day Rolling Average Sulfur Content Weight Percent is exceeded until compliance is achieved, and an explanation of any periods of downtime of any relevant equipment that prohibited the collection of such data;

d.  All CEMS data collected for each Process System, from the time any Emissions Limit and Sunray $NO_x$ Cap in Sections VI ($SO_2$ Control Technology, Emissions Limits, and Monitoring Requirements) and VII

(NO$_x$ Control Technology, Emissions Limits, and Monitoring Requirements) is exceeded until compliance is achieved, and an explanation of any periods of downtime of such CEMS;

e.  A copy of the protocol for any PM stack tests performed in accordance with the requirements of Paragraph 32;

f.  All PM Early Warning System data collected, from the time a PM Early Warning System alarm is triggered until the PM Early Warning System data have returned to  below the action levels triggering an alarm condition, and an explanation of any periods of PM Early Warning System downtime;

g.  A description of any potential violation of the requirements of this Consent Decree, including any exceedance resulting from Malfunctions, any exceedance of an Emissions Limit, any exceedance of the Sunray NO$_x$ Cap, any exceedance of a 30-day Rolling Average Sulfur Content Weight Percent or 365-day Rolling Average Sulfur Content Weight Percent, or any failure to install, commence operation or Continuously Operate any Control Technology or any PM Early Warning System, which includes:

i.  the date and duration of, and the quantity of any emissions related to, the potential violation;

ii.  a full explanation of the primary cause and any other significant contributing cause(s) of the potential violation;

iii.  an analysis of all reasonable interim and long-term remedial steps or corrective actions, including all design, operation, and

49

maintenance changes consistent with good engineering practices, if any, that could be taken to reduce or eliminate the probability of recurrence of such potential violation, and, if not already completed, a schedule for its (their) implementation, or, if Defendant concludes that remedial steps or corrective actions should not be conducted, the basis for that conclusion;

h. If no violations occurred during a reporting period, a statement that no violations occurred;

i. A description of the status of any permit applications and any proposed SIP revisions required under this Consent Decree; and

j. A summary of all actions undertaken and Project Dollars expended during the reporting period, as well as any cumulative Project Dollars expended, and the estimated environmental benefits achieved to date in satisfaction of the requirements of Section V (Environmental Mitigation) and Appendix A.

54. If Defendant violates, or has reason to believe that it may violate, any requirement of this Consent Decree, including any exceedance resulting from Malfunctions, any exceedance of an Emissions Limit, any exceedance of the Sunray $NO_x$ Cap, any exceedance of a 30-day Rolling Average Sulfur Content Weight Percent or 365-day Rolling Average Sulfur Content Weight Percent, any failure to install, commence operation or Continuously Operate any Control Technology or any PM Early Warning System, or any event that triggers a PM Early Warning System alarm, Defendant shall notify EPA and Plaintiff-Intervenors of such event, and its likely duration, in writing, within 30 Business Days of the Day Defendant first becomes aware that it

50

has violated or may violate the Decree, with an explanation of the likely cause of the event, remedial steps or corrective action taken, or to be taken, including all design, operation, and maintenance changes consistent with good engineering practices, if any, to reduce or eliminate the probability of recurrence of such violation. Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section XV (Force Majeure) if Defendant contends a Force Majeure event occurred.

55. Whenever any violation of this Consent Decree, or of any applicable permits required under this Consent Decree, or any other event affecting Defendant's performance under this Decree may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify EPA and the applicable Plaintiff-Intervenor, orally or by electronic or facsimile transmission as soon as possible, but no later than seven Days after Defendant first knew, or should have known, of the violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

56. Within 60 Days following the completion of each Environmental Mitigation Project required under this Consent Decree, Defendant shall submit to the EPA and the applicable Plaintiff-Intervenor a report that documents the date that the Environmental Mitigation Project was completed, the results from implementing the Environmental Mitigation Project, including the emission reductions or other environmental benefits achieved, and the Project Dollars expended by Defendant in implementing the Environmental Mitigation Project.

57. All reports shall be submitted as set forth in Section XXI (Notices). All data shall be reported using the number of significant digits in which the pertinent standard or limit is expressed.

51

58.     Each report submitted by Defendant under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

59.     The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the Clean Air Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

60.     Any information provided pursuant to this Consent Decree may be used by the Plaintiffs in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

61.     Defendant may also assert that information required to be provided under this Section is protected as "Confidential Business Information" ("CBI") under 40 C.F.R. Part 2 or any applicable state laws.  If the Defendant elects to do so, it shall designate any such information as CBI subject to 40 C.F.R. Part 2 or the applicable state law, and follow the requirements of 40 C.F.R. Part 2 or the applicable state law for the protection of such information, including by segregating the CBI material from the rest of the report, and substantiating each element of each CBI claim in the report.  No monitoring data or other data

52

evidencing the amount or content of emissions from any Facility shall be considered as CBI or subject to any privilege, provided, however, that nothing within this provision prohibits Defendant from invoking Paragraph 94 and the confidential business determination process specified therein, including over feedstock information.  Plaintiffs reserve all rights to dispute such a claim.

## XIV.  STIPULATED PENALTIES

62.    Defendant shall be liable for stipulated penalties to the United States for violations of this Consent Decree, and to the United States and the applicable Plaintiff-Intervenors for violations of this Consent Decree with respect to Ponca, Phenix and Sunray, as specified in the table below, unless excused under Section XV (Force Majeure) or Defendant establishes a defense under Section XVI (Affirmative Defense to Certain Stipulated Penalties). Violation of any Emissions Limit, 30-day Rolling Average Sulfur Content Weight Percent, or 365-day Rolling Average Sulfur Content Weight Percent is a violation on every Day on which the average or sum is based and each subsequent Day of violation of such Emissions Limit, 30-day Rolling Average Sulfur Content Weight Percent, or 365-day Rolling Average Sulfur Content Weight Percent is subject to the corresponding penalty per Day as specified in the table below, provided that, when a violation of an Emissions Limit (for the same pollutant and from the same source), 30-day Rolling Average Sulfur Content Weight Percent, or 365-day Rolling Average Sulfur Content Weight Percent recurs within periods of less than seven Days, Defendant shall not pay a second or multiple daily stipulated penalty for any Day of recurrence for which a stipulated penalty is already payable. Stipulated penalties may only be assessed once for a given Day within any averaging or summation period for violation of any particular Emissions Limit,

53

Sunray NO$_x$ Cap, 30-day Rolling Average Sulfur Content Weight Percent, or 365-day Rolling

Average Sulfur Content Weight Percent.

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| a.  Failure to pay the civil penalty as specified in Section IV (Civil Penalty) | $5,000 per Day |
| b.  Failure to comply with any applicable Emissions Limit, Sunray NO$_x$ Cap, 30-day Rolling Average Sulfur Content Weight Percent, or 365-day Rolling Average Sulfur Content Weight Percent, where the violation is less than 5% in excess of the limits set forth in this Consent Decree | $1,000 per Day per violation |
| c.  Failure to comply with any applicable Emissions Limit, Sunray NO$_x$ Cap, 30-day Rolling Average Sulfur Content Weight Percent, or 365-day Rolling Average Sulfur Content Weight Percent, where the violation is equal to or greater than 5% but less than 10% in excess of the limits set forth in this Consent Decree | $2,000 per Day per violation |
| d.  Failure to comply with any applicable Emissions Limit, Sunray NO$_x$ Cap, 30-day Rolling Average Sulfur Content Weight Percent, or 365-day Rolling Average Sulfur Content Weight Percent, where the violation is greater than 10% in excess of the limits set forth in this Consent Decree | $3,000 per Day per violation |
| e.  Failure to install, commence operation, or Continuously Operate a Control Technology required under this Consent Decree | $5,000 per Day per violation during the first 30 Days, $10,000 per Day per violation for the next 30 Days, and $37,500 per Day per violation thereafter |
| f.  Failure to install, commence operation, or Continuously Operate a PM  Early Warning System as required under this Consent Decree | $1,000 per Day per violation |
| g.  Failure to install or operate a CEMS as required in this Consent Decree | $1,000 per Day per violation |

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| h.  Failure to apply for any permit required by Section XI (Permits) | $1,000 per Day per violation |
| i.  Failure to timely submit, modify, or implement, as approved, the reports, plans, studies, analyses, protocols, or other submittals required in this Consent Decree | $750 per Day per violation during the first ten Days, $1,000 per Day per violation thereafter |
| j.  Failure to timely submit, modify, or implement, as approved, a report, plan, study, analysis, protocol, or other submittal required with respect to Environmental Mitigation Projects prescribed in Section V (Environmental Mitigation) or Appendix A | $750 per Day per violation during the first ten Days, $1,000 per Day per violation thereafter |
| k.  Any other violation of this Consent Decree | $1,000 per Day per violation |

63.     Subject to the provisions of Paragraph 62 above, stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Nothing in this Consent Decree shall prevent the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree. The United States or Plaintiff-Intervenors, or any of the foregoing, may seek stipulated penalties under this Section with respect to violations involving Ponca (ODEQ only) and Phenix (State of Alabama only).  The United States alone may seek stipulated penalties with respect to violations involving Sunray.  Where the United States and a Plaintiff-Intervenor seek stipulated penalties for the same violation of this Consent Decree, Defendant shall pay 50% to the United States and 50% to the Plaintiff-Intervenor.  The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiffs.

64.     Defendant shall pay any stipulated penalty within 30 Days of receiving the United States' and/or Plaintiff-Intervenors' written demand, unless Defendant elects within 20 Days of

receipt of written demand to dispute the imposition or accrual of stipulated penalties in accordance with the provisions in Section XVII (Dispute Resolution) of this Consent Decree.

65.    EPA and Plaintiff-Intervenors may, in the unreviewable exercise of their collective or individual discretion, reduce or waive their portion of stipulated penalties otherwise due to either the United States or Plaintiff-Intervenors under this Consent Decree.

66.    Stipulated penalties shall continue to accrue as provided in this Section during any dispute, with interest on accrued stipulated penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

a.    If the dispute is resolved by agreement between the Parties or by a decision of the United States and/or Plaintiff-Intervenors that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest accruing from the 31st Day after the written demand in Paragraph 64, within 30 Days of the effective date of the agreement or the receipt of EPA's and/or Plaintiff-Intervenors' decision or order.

b.    If the dispute is appealed to the Court and the United States and/or Plaintiff-Intervenors are the prevailing party, in whole or in part, as may be determined by the Court, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest accruing from the 31st Day after the written demand in Paragraph 64, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

56

c.     If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest accruing from the 31st Day after the written demand in Paragraph 64, within 15 Days of receiving the final appellate court decision.

67.     Defendant shall pay stipulated penalties owing to the United States and/or Plaintiff-Intervenors in the manner set forth and with the confirmation notices to the persons specified in Section IV (Civil Penalty), except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

68.     If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States and/or Plaintiff-Intervenors from securing any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

69.     The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States and/or Plaintiff-Intervenors for Defendant's violation of this Consent Decree or applicable law, except that for any violation of this Consent Decree that is also a violation of any applicable statute or regulation, Defendant shall be allowed a credit, dollar for dollar, for any stipulated penalties paid, against any statutory penalties imposed for such violation, including penalties resulting from enforcement pursuant to Paragraphs 58 and 64.

## XV.  FORCE MAJEURE

70.     "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, its Contractors, or entity controlled by Defendant that causes a delay or impediment to performance in complying with any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation.  The requirement that Defendant exercises best efforts to fulfill the obligation includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay and/or violation and/or emissions during such event to the greatest extent possible.  Force Majeure does not include Defendant's financial inability to perform any obligation under this Consent Decree. Unanticipated or increased costs or expenses associated with the performance of Defendant's obligations under this Consent Decree shall not constitute circumstances beyond Defendant's control, nor serve as the basis for an extension of time under this Section, and shall not constitute an event of Force Majeure.

71.     If any event occurs or has occurred that may delay or prevent compliance with the performance of any obligation under this Consent Decree, as to which Defendant intends to assert a claim as an event of Force Majeure, Defendant shall provide notice orally or by electronic or facsimile transmission to the representatives of EPA and Plaintiff-Intervenors designated to receive notice pursuant to Section XXI (Notices) as soon as practicable but no later than seven Business Days following the date Defendant first knew that the claimed Force Majeure event may cause such delay and give rise to a claim of Force Majeure. Defendant shall provide written notice of the event as soon as practicable, but in no event later than 21 Business Days following the date when Defendant first knew that the event might cause such delay. The

written notice shall reference this Paragraph of the Consent Decree and explain and describe the reasons for the delay, the anticipated duration of the delay, all actions taken or to be taken to prevent or minimize the delay, a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay, and Defendant's rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim. Defendant shall include with any written notice all available documentation supporting the claim that the delay was attributable to a Force Majeure event. Defendant shall be deemed to know of any circumstance of which Defendant's Contractors, or any entity controlled by it, knew or should have known.

72.    Failure by Defendant to comply with the notice requirements of Paragraph 71 renders this Section voidable by EPA, as to the specific event for which Defendant has failed to comply with such notice requirement.  If so voided, it shall be of no effect as to the particular event involved.

73.    If EPA, after consultation with Plaintiff-Intervenors, agrees that the delay or anticipated delay is attributable to a Force Majeure event, the Parties may reach agreement and stipulate in writing to an extension of the required deadline(s) for all requirement(s) affected by the Force Majeure event for a period equivalent to the delay actually caused by the Force Majeure event, or such other period as may be appropriate in light of the circumstances.  If such stipulation results in a material change to the terms of the Consent Decree, the stipulation shall be filed as a modification to the Consent Decree pursuant to Section XXIV (Modification).  An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation.  If the Parties do not reach agreement on the appropriate extension of any deadlines affected by a Force Majeure event, EPA will notify Defendant in writing of the length of the extension, if any, for

performance of the obligations affected by the Force Majeure event.  Defendant shall comply with the extended deadlines specified in the notice from EPA, subject to the provisions of Section XVII (Dispute Resolution).

74.     If EPA, after consultation with Plaintiff-Intervenors, does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, EPA will notify Defendant in writing of its decision.

75.     If Defendant elects to invoke the formal dispute resolution procedures set forth in Section XVII (Dispute Resolution), it shall do so no later than 45 Days after receipt of EPA's notice pursuant to Paragraph 73 or Paragraph 74, whichever applies, and shall first comply with the provisions for informal dispute resolution contained in Section XVII before proceeding to formal dispute resolution.  In any such proceeding in accordance with formal dispute resolution procedures, Defendant shall have the burden of demonstrating that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 66-67, above.  If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

76.     This Court shall not draw any inferences nor establish any presumptions adverse to any Party as a result of Defendant delivering a notice of Force Majeure or the Parties' inability to reach agreement.

## XVI.  AFFIRMATIVE DEFENSES TO CERTAIN STIPULATED PENALTIES

77.    If any of Defendant's Process Systems exceeds a 3-hour Average Emissions Limit, or a 7-day Rolling Average Emissions Limit due to a Malfunction, Defendant, bearing the burden of proof by a preponderance of the evidence, has an affirmative defense to a claim for stipulated penalties under this Consent Decree, if Defendant complies with the notice and reporting requirements of Paragraph 78 of this Section, and demonstrates all of the following:

a.    The excess emissions were caused by a sudden, unavoidable breakdown of technology, beyond Defendant's control;

b.    The excess emissions did not stem from any activity or event that was foreseeable and avoidable, nor could have been avoided by operation and maintenance practices in accordance with manufacturers' specifications and good engineering and maintenance practices;

c.    The air pollution control equipment and processes were maintained and operated in a manner consistent with good practice for minimizing emissions;

d.    Repairs were made as expeditiously as practical when Defendant knew or should have known that the applicable 3-hour Average Emissions Limit, or a 7-day Rolling Average Emissions Limit was being or would be exceeded;

e.    Defendant took measures to limit the amount and duration of the excess emissions (including any bypass) in a manner consistent with good practice for minimizing emissions;

61

      f.      All practical steps were taken to minimize the impact of the excess emissions on ambient air quality;

      g.      Relevant emission monitoring systems were kept in operation to the extent practical;

      h.      Defendant's actions in response to the excess emissions were documented by properly signed or otherwise validated contemporaneous operating logs, if applicable, or other relevant evidence;

      i.      The excess emissions were not part of a recurring pattern indicative of inadequate design, operation, or maintenance; and

      j.      Defendant properly and promptly notified Plaintiffs as required by this Consent Decree.

78.      To assert an affirmative defense for Malfunction under Paragraph 77, Defendant shall provide notice to the Plaintiffs in writing of Defendant's intent to assert an affirmative defense in Defendant's semi-annual progress reports required by Paragraph 53.  The notice shall contain:

      a.      The identity of each stack or other emission point where the excess emissions occurred;

      b.      The magnitude of the excess emissions expressed in the units of the applicable Emissions Limits and the operating data and calculations used in determining the magnitude of the excess emissions;

      c.      The time and duration or expected duration of the excess emissions;

      d.      The identity of the equipment from which the excess emissions emanated;

      e.      The nature and cause of the emissions;

62

  f.  The steps taken to remedy the Malfunction and the steps taken or planned to prevent the recurrence of the Malfunctions;

  g.  The steps that were or are being taken to limit the excess emissions; and

  h.  If Defendant's permit contains procedures governing source operation during periods of Malfunction and the excess emissions resulted from Malfunction, a list of the steps taken to comply with the permit procedures.

79. The affirmative defense provided herein is only an affirmative defense to stipulated penalties for violations of this Consent Decree, and not a defense to any civil or administrative action for injunctive relief. A Malfunction shall not constitute a Force Majeure Event unless the Malfunction also meets the definition of a Force Majeure Event, as provided in Section XV (Force Majeure).

## XVII. DISPUTE RESOLUTION

80. The dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree, including, but not limited to, Section XIV (Stipulated Penalties) and Section XV (Force Majeure). Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action to enforce any obligation of Defendant arising under this Decree.

81. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendant sends the United States, and the applicable Plaintiff-Intervenor, a written notice of Dispute.  Such notice of dispute shall clearly describe the nature of the dispute and shall state

Defendant's position with regard to such dispute. The Parties shall expeditiously schedule a meeting to discuss the dispute informally not later than 10 days after the receipt of such notice. The period of informal negotiations shall not exceed 20 Days from the date of sending the notice of dispute, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States, after consultation with the applicable Plaintiff-Intervenor, shall be considered binding unless, within 20 Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

82.    Defendant may invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States and the applicable Plaintiff-Intervenor, in accordance with Section XXI (Notices), a written statement of position regarding the matter in dispute.  The statement of position shall include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

83.    The United States, after consultation with the applicable Plaintiff-Intervenor, shall serve its statement of position within 45 Days of receipt of Defendant's statement of position. The United States' statement of position shall include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The statement of position of the United States shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

84.    Defendant may seek judicial review of the dispute by filing with the Court, and serving on the United States and the applicable Plaintiff-Intervenor, in accordance with Section

XXI (Notices), a motion requesting judicial resolution of the dispute.  The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.  The United States, after consultation with the applicable Plaintiff-Intervenor, shall file its response to Defendant's motion within 21 Days of the date of service of the motion, which shall be served on Defendant in accordance with Section XXI (Notices) and the electronic case filing (ECF) requirements of the Court.  Defendant may file a reply within 7 Days of the date of service of the response in accordance with Section XXI (Notices) and the ECF filing requirements of the Court.

85.	Except as otherwise provided in this Consent Decree, the Court shall decide all disputes pursuant to applicable principles of law.  The disputing Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute in the Parties' initial filings with the Court under Paragraphs 83 and 84.  Except as otherwise provided in this Consent Decree, in any dispute brought under this Section XVII (Dispute Resolution), Defendant shall bear the burden of demonstrating that its position complies with this Consent Decree.

86.	The time periods set out in this Section may be shortened or lengthened by a joint motion among the Parties or upon motion to the Court by one of the Parties to the dispute, explaining the basis for seeking such a scheduling modification.

87.	The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with

respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute and in accordance with any extension or modification of the schedule for completion of work as provided in Paragraph 73.  If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIV (Stipulated Penalties).

88.    As part of the resolution of any dispute under this Section, in appropriate circumstances the disputing Parties may agree, in writing, or this Court may order, an extension or modification of the schedule for the completion of the work required under this Consent Decree.  Defendant shall be liable for stipulated penalties pursuant to Section XIV (Stipulated Penalties) for its failure thereafter to complete the work in accordance with the extended or modified schedule, provided that Defendant shall not be precluded from asserting that an event of Force Majeure has caused or may cause a delay in complying with the extended or modified schedule.

89.    Issuance, renewal, modification, denial or revocation of a permit and issuance of orders or other actions by state agencies are not themselves subject to dispute resolution under this Consent Decree.  However, subject to Section XI (Permits) and XV (Force Majeure), this Paragraph in no way limits Defendant's right to assert in a dispute under this Decree that a State's action or inaction (on a permit application or any other request by Defendant) prevented Defendant from complying with an obligation under this Decree.

## XVIII.  INFORMATION COLLECTION AND RETENTION

90.    The United States, and its authorized representatives, including attorneys, contractors, and consultants, shall have the right of entry into any Facility covered by this Consent Decree, and ODEQ (as to Ponca only) and ADEM (as to Phenix only) and its

66

representatives, including attorneys, contractors, and consultants, shall have the right of entry, at all reasonable times, upon presentation of credentials, to:

    a.    monitor the progress of activities required under this Consent Decree;

    b.    verify any data or information submitted to the United States or ODEQ or ADEM in accordance with the terms of this Consent Decree;

    c.    obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, Contractors, or consultants;

    d.    obtain copies of documents, including photographs and similar data, relating to activities required under this Consent Decree; and

    e.    assess Defendant's compliance with this Consent Decree.

91. Until five years after the complete termination of this Consent Decree, Defendant shall retain in electronic form, and shall instruct its Contractors and agents to preserve in electronic form, all non-identical copies of all documents and records in their or their Contractors' or agents' possession or control, or that come into their or their Contractors' or agents' possession or control, and that relate to Defendant's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States or the applicable Plaintiff-Intervenor, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

92. At the conclusion of the information-retention period provided in Paragraph 91 above, Defendant shall notify the United States and the applicable Plaintiff-Intervenor at least 90 Days prior to the destruction of any documents, records, or other information subject to the

requirements of Paragraph 91 and, upon request by the United States or the applicable Plaintiff-Intervenor, Defendant shall deliver any such documents, records, or other information to EPA or the applicable Plaintiff-Intervenor.

93.    Defendant may assert that documents, records, or other information requested by the United States or Plaintiff-Intervenors under this Decree are privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Defendant asserts such a privilege, it shall provide the following:  (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the basis of the privilege asserted by Defendant.  However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

94.    All information and documents submitted by Defendant pursuant to this Consent Decree shall be subject to any requests under applicable law providing public disclosure of documents unless (a) the information and documents are subject to legal privileges or protection or (b) Defendant claims and substantiates in accordance with 40 C.F.R. Part 2 and any applicable State law that the information and documents contain confidential business information.

95.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the applicable Plaintiff-Intervenor pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

68

## XIX.  EFFECT OF SETTLEMENT / RESERVATION OF RIGHTS

96.     Entry of this Consent Decree shall resolve all civil claims of the United States and Plaintiff-Intervenors arising under Parts C or D of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470 to 7492, the regulations promulgated thereunder at 40 C.F.R. §§ 51.21, 51.165 and 51.166, the portions of applicable SIPs and related rules adopted pursuant to 40 C.F.R. §§ 51.165 and 51.166, and under Subchapter V of the Clean Air Act, §§ 7661 to 7661f and the regulations promulgated thereunder, with respect to $SO_2$, $NO_x$ and PM and any permit condition that incorporates one or more of the foregoing regulatory provisions, that arose from modifications of the Process Systems covered by this Consent Decree that commenced prior to the Date of Lodging of this Consent Decree, including without limitation the allegations of noncompliance set forth in the Complaints and in the Notices of Violation issued by EPA to Defendant.

97.     Notwithstanding the resolution of liability in Paragraph 96, nothing in this Consent Decree precludes the United States and/or Plaintiff-Intervenors from seeking from Defendant injunctive relief, penalties, or other appropriate relief for violations by Defendant of the regulatory requirements identified in Paragraph 96 resulting from (1) construction or modification that commenced prior to the Date of Lodging of the Consent Decree, if the resulting violations do not relate to the Process Systems covered by this Consent Decree or do not relate to $NO_x$, $SO_2$ or PM or (2) any construction or modification that commences after the Date of Lodging of the Consent Decree.  Nothing in this Consent Decree limits or restricts any defenses otherwise available to Defendant in responding to any enforcement action addressed by this Paragraph.

98.     The United States and Plaintiff-Intervenors reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree.  This Consent Decree shall

69

not be construed to limit the rights of the United States or Plaintiff-Intervenors to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraph 96. The United States and Plaintiff-Intervenors further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, one or more of Defendant's Facilities, whether related to the violations addressed in this Consent Decree or otherwise.

99. In any subsequent administrative or judicial proceeding initiated by the United States or Plaintiff-Intervenors for injunctive relief, civil penalties, or other appropriate relief relating to the Facilities or to Defendant's violations, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or Plaintiff-Intervenors in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 96 of this Section.

100. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations. Defendant is responsible for achieving and maintaining compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and Plaintiff-Intervenors do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this

Consent Decree will result in compliance with provisions of the Act, 42 U.S.C. § 7401 et seq., or with any other provisions of federal, state, or local laws, regulations, or permits.

101.    This Consent Decree does not limit or affect the rights of Defendant or of the United States or Plaintiff-Intervenors against any third parties not party to this Consent Decree, nor does it limit the rights of third parties not party to this Consent Decree, against Defendant, except as otherwise provided by law.

102.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XX.  COSTS

103.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and Plaintiff-Intervenors shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendant.

## XXI.  NOTICES

104.    Unless otherwise provided herein, whenever notifications, submissions, or communications are required by the Consent Decree, they shall be made in writing and addressed as follows:

To EPA:

Director, Air Enforcement Division
U.S. Environmental Protection Agency
MC 2242A
1200 Pennsylvania Ave. NW
Washington, D.C. 20460

And

71

John Blevins
Director
Compliance Assurance and Enforcement Division
U.S. Environmental Protection Agency, Region 6
1445 Ross Ave.
Dallas, TX 75202-2733

And

Beverly H. Banister
Director
Air, Pesticides and Toxics Management Division
U.S. Environmental Protection Agency, Region 4
61 Forsyth Street
Atlanta, GA  30303

To the United States (in addition to the EPA addresses above):

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C.  20044-7611
Re: DOJ No. 90-5-2-1-09729

For all submissions referring to the Ponca Facility, to the State of ODEQ:

Eddie Terrill, Director
Oklahoma Department of Environmental Quality
Air Quality Division
P.O. Box 1677
Oklahoma City, Oklahoma 73101-1677

and

Laura J. Finley, Supervising Attorney
Office of General Counsel
Oklahoma Department of Environmental Quality
P.O. Box 1677
Oklahoma City, Oklahoma 73101-1677

72

<u>For all submissions referring to the Phenix Facility, to the State of Alabama:</u>

Chief, Air Division
Alabama Department
Of Environmental Management
Post Office Box 301463
Montgomery, Alabama 36130-1463

<u>To Defendant:</u>

Continental Carbon Company
16850 Park Row
Houston, Texas  77084
Attn: Dennis Hetu, President


Continental Carbon Company
16850 Park Row
Houston, Texas  77084
Attn: Todd Miller, Director – Environment, Health and Safety


105.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address or means of transmittal provided in this Section XXI.

106.    All notifications, communications, or submissions made pursuant to this Section shall be sent as follows:  (a) by overnight mail or overnight delivery service to the EPA, and by overnight mail to the United States (in addition to the EPA, as set forth in paragraph 104), with a copy by electronic mail if practicable; (b) by electronic mail to all Plaintiff-Intervenors, if practicable, but if not practicable, then by overnight mail or overnight delivery service to Plaintiff-Intervenors; and (c) if to Defendant, by overnight mail or overnight delivery service, with a copy by electronic mail if practicable.

107.    Notices submitted pursuant to this Section shall be deemed submitted upon delivery to the overnight delivery service, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXII.  EFFECTIVE DATE

108.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's Docket.

## XXIII.  RETENTION OF JURISDICTION

109.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XVII (Dispute Resolution) and XXIV (Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XXIV.  MODIFICATION

110.    The terms of this Consent Decree, including the Appendices, may be modified only by a subsequent written agreement signed by the Plaintiffs and Defendant.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

111.    Any disputes concerning modification of this Decree or the issue of the materiality of any modification of this Decree shall be resolved pursuant to Section XVII (Dispute Resolution) of this Decree, provided however, that, instead of the burden of proof provided by Paragraph 85, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXV.  SALES OR TRANSFER OF OPERATIONAL OR OWNERSHIP INTERESTS

112.    At least 60 Days prior to any transfer of ownership or operation of any Facility, Defendant shall provide a copy of this Consent Decree to the proposed transferee and shall

74

simultaneously provide written notice of the prospective transfer, to EPA, the United States, and Plaintiff-Intervenors in accordance with Section XXI (Notices) of this Consent Decree, and subject to the provisions of Paragraph 94 of this Consent Decree.  No transfer of ownership or operation of a Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Consent Decree are implemented, unless and until:

   a.   the transferee agrees, in writing, to undertake the obligations required by Sections V (Environmental Mitigation), VI ($SO_2$ Control Technology, Emissions Limits, And Monitoring Requirements), VII ($NO_x$ Control Technology, Emissions Limits, And Monitoring Requirements), VIII (PM Control Technology, Emissions Limits, Best Management Practices, and Monitoring Requirements), IX (Prohibition on Use of Sunray Non-Assisted Flares), X (Prohibition on Netting Credits or Offsets), XI (Permits), XII (Review and Approval of Submittals), XIII (Reporting and Recordkeeping Requirements), XIV (Stipulated Penalties), XV (Force Majeure), XVII (Dispute Resolution), and XVIII (Information Collection and Retention) applicable to such Facility, and to be substituted for Defendant as a Party under the Decree with respect to such Facility and thus to become bound by the terms thereof;

   b.   the United States and Plaintiff-Intervenors consent, in writing, to relieve Defendant of its Consent Decree obligations applicable to such Facility, and

75

    c.    the transferee becomes a party to this Consent Decree with respect to the transferred Facility, pursuant to Section XXIV (Modification).

113.    Any attempt to transfer ownership or operation of any of the Facilities or any portion thereof, without complying with Paragraph 112(a)-(c) above constitutes a violation of this Consent Decree.

## XXVI.  PUBLIC PARTICIPATION

114.    The Parties agree and acknowledge that final approval by the United States and entry of this Consent Decree are subject to the procedures of 28 C.F.R. § 50.7, which provides for notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public comment, and the right of the United States to withdraw or withhold consent if the comments disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper, or inadequate.  The Defendant shall not oppose entry of this Consent Decree by this Court or challenge any provision of this Consent Decree unless the United States has notified the Defendant, in writing, that the United States no longer supports entry of the Consent Decree.

## XXVII.  TERMINATION

115.    <u>Termination as to an Individual Facility</u>.  After Defendant has paid the Section IV civil penalty and any stipulated penalties due under this Consent Decree, and satisfied the requirements of Sections VI ($SO_2$ Control Technology, Emissions Limits, and Monitoring Requirements), VII ($NO_x$ Control Technology, Emissions Limits, and Monitoring Requirements), VIII (PM Control Technology, Emissions Limits, Best Management Practices, and Early Warning System Requirements), IX (Prohibition on Use of Sunray Non-Assisted Flares), X (Prohibition on Netting Credits or Offsets), and XI (Permits) of this Decree and has maintained operation of any Control Technology as required by this Consent Decree for a period of 24

consecutive Months at an individual Facility, Defendant may serve upon the United States and Plaintiff-Intervenors a request for termination pursuant to the requirements of Paragraph 118. With respect to the $SO_2$ Emissions Limits at Ponca and Phenix, Defendant shall maintain operation of any Control Technology as required by this Consent Decree and achieve and maintain the Final 7-day Rolling Average Emissions Limit for $SO_2$ and Final 365-day Rolling Average Emissions Limit $SO_2$, and with respect to the $NO_x$ Emissions Limits at Sunray, Defendant shall maintain operation of the Low $NO_x$ Combustion System as required by this Consent Decree and achieve and maintain the Final 7-day Rolling Average Emissions Limit for $NO_x$ and Final 365-day Rolling Average Emissions Limit $NO_x$, for a period of 12 consecutive Months at an individual Facility, prior to serving upon the United States and Plaintiff-Intervenors a request for termination pursuant to the requirements of Paragraph 118. If the United States and Plaintiff-Intervenors agree that the Decree as it relates to an individual Facility may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating those provisions of the Decree.

116.    <u>Termination as to Environmental Mitigation</u>.  After Defendant has paid the Section IV civil penalty and any stipulated penalties with respect to Environmental Mitigation due under this Consent Decree, and satisfied the requirements of Section V (Environmental Mitigation), Defendant may serve upon the United States and Plaintiff-Intervenors a Request for Termination pursuant to the requirements of Paragraph 118. If the United States and Plaintiff-Intervenors agree that the Decree as it relates to the requirements of Section V (Environmental Mitigation) may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating those provisions of the Decree.

117.    <u>Complete Termination</u>.  After Defendant has satisfied the  requirements of Sections IV (Civil Penalty), V (Environmental Mitigation), VI ($SO_2$ Control Technology, Emissions Limits, and Monitoring Requirements), VII ($NO_x$ Control Technology, Emissions Limits, and Monitoring Requirements), VIII (PM Control Technology, Emissions Limits, Best Management Practices, and Early Warning System Requirements), IX (Prohibition on Use of Sunray Non-Assisted Flares), X (Prohibition on Netting Credits or Offsets), and XI (Permits) of this Decree and has maintained satisfactory compliance with the obligation to operate the Control Technology as required by this Consent Decree for a period of 24 consecutive Months at all Facilities, has complied with all other requirements of this Consent Decree, and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree,  Defendant may serve upon the United States and the relevant Plaintiff-Intervenor a request for termination pursuant to the requirements of Paragraph 118.  With respect to the $SO_2$ Emissions Limits at Ponca and Phenix, Defendant shall maintain operation of any Control Technology as required by this Consent Decree and achieve and maintain the Final 7-day Rolling Average Emissions Limit for $SO_2$ and Final 365-day Rolling Average Emissions Limit $SO_2$, and with respect to the $NO_x$ Emissions Limits at Sunray, Defendant shall maintain operation of the Low NOx Combustion System as required by this Consent Decree and achieve and maintain the Final 7-day Rolling Average Emissions Limit for $NO_x$ and Final 365-day Rolling Average Emissions Limit $NO_x$, for a period of 12 consecutive Months at an individual Facility, prior to serving upon the United States and Plaintiff-Intervenors a request for termination pursuant to the requirements of Paragraph 118.  If the United States and the Plaintiff-Intervenor agree that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

78

118.    Request for Termination.  If Defendant elects to terminate this Consent Decree in whole or part, Defendant shall submit a written report to EPA and Plaintiff-Intervenors, as set forth in Section XXI (Notices), that (a) describes the activities undertaken, (b) attaches any applicable permits or SIP amendments obtained pursuant to the requirements of Section XI (Permits) that incorporate the requirements that will survive termination of this Consent Decree that are listed in Paragraph 43, and (c) certifies that each of the applicable Sections listed in Paragraphs 115 - 117 have been completed in full satisfaction of the requirements of this Consent Decree and that Defendant is in full compliance with those Sections of the Consent Decree.  The report will contain the following certification, signed by an official of Defendant:

> "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

119.    If the United States and Plaintiff-Intervenors do not agree that the Consent Decree as a whole or as it relates to an individual Facility may be terminated, Defendant may invoke dispute resolution under Section XVII (Dispute Resolution) of this Decree.  However, Defendant shall not seek resolution of any dispute regarding termination under Section XVII (Dispute Resolution) until 60 Days after service of its Request for Termination.

## XXVIII.  SIGNATORIES/SERVICE

120.    Each undersigned representative of Defendant and Plaintiff-Intervenors, and the Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice, certifies that he or she is fully authorized to enter into the terms and

conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

121.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.  All Parties agree that Defendant need not file an answer or otherwise respond to the Complaints in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXIX.  INTEGRATION

122.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  No other document, nor any representation, inducement, agreement, understanding or promise constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXX.  FINAL JUDGMENT

123.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Plaintiffs and Defendant.

## XXXI.  APPENDICES

124.    The following Appendices are attached to and incorporated as part of this Consent Decree:

"Appendix A" contains the requirements of the Environmental Mitigation Projects.

"Appendix B" contains the Other PM Control Requirements.

"Appendix C" contains the Particulate Emissions Best Management Practices Control Plan.

"Appendix D" contains the PM Early Warning System requirements.

"Appendix E" contains the Protocol For Setting Final $SO_2$ Emission Limits

"Appendix F" contains the Protocol For Setting Final $NO_x$ Emission Limits

All terms in the Appendices shall be construed in a manner consistent with this Decree.

Dated this 7th day of May, 2015.

_____

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

Signature Page for *United States of America* et al *v.*
*Defendant Continental Carbon Company,* Consent Decree

FOR PLAINTIFF UNITED STATES OF AMERICA:

/s/ John C. Cruden_____          Date:   3/19/2015
JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice

/s/ James A. Lofton_____          Date:   3/20/2015
JAMES A. LOFTON
Counsel to the Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611

/s/ Jason A. Dunn_____          Date:   3/20/2015
JASON A. DUNN
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611

(Signed copy bearing original signatures is filed as Doc. # 4-1 and is being maintained in
the office of Filing Attorney Jason A. Dunn)

82

Signature Page for *United States of America* et al *v. Defendant Continental Carbon Company,* Consent Decree

FOR PLAINTIFF UNITED STATES OF AMERICA:

SANFORD C. COATS
United States Attorney
Western District of Oklahoma

BY:

/s/ Kay Sewell_____          Date:  3/12/2015
KAY SEWELL
Assistant U.S. Attorney
Western District of Oklahoma
210 Park Avenue, Suite 400
Oklahoma City, OK 73102

(Signed copy bearing original signature is filed as Doc. # 4-1 and is being maintained in the office of Filing Attorney Jason A. Dunn)

82.a

Signature Page for *United States of America* et al *v. Defendant Continental Carbon Company.*, Consent Decree


FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:


/s/ Cynthia Giles_____                    Date:    2/27/2015
CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


/s/ Phillip A. Brooks_____                Date:    2/26/2015
PHILLIP A. BROOKS
Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


/s/ Kellie Ortega_____                Date:    2/26/2015
KELLIE ORTEGA
Attorney-Advisor, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


/s/ Charlie Garlow_____               Date:    2/26/2015
CHARLIE GARLOW
Attorney-Advisor, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


(Signed copy bearing original signatures is filed as Doc. # 4-1 and is being maintained in the office of Filing Attorney Jason A. Dunn)

83

Signature Page for *United States of America* et al. *v. Defendant Continental Carbon Company,* Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:


/s/ John Blevins_____          Date:  3/2/2015
JOHN BLEVINS
Director
Compliance Assurance and Enforcement Division
U.S. Environmental Protection Agency, Region 6
1445 Ross Ave.
Dallas, TX 75202-2733

(Signed copy bearing original signature is filed as Doc. # 4-1 and is being maintained in the office of Filing Attorney Jason A. Dunn)

Signature Page for *United States of America* et al. *v. Defendant Continental Carbon Company,* Consent Decree

FOR THE STATE OF ALABAMA AND THE ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT


LUTHER STRANGE, ATTORNEY GENERAL


By:_/s/ Shawn Sibley_____          Date  3/12/2015
S. SHAWN SIBLEY
Assistant Attorney General and
Associate General Counsel
Alabama Department of
Environmental Management
Post Office Box 301463
Montgomery, AL 36130-1463


/s/ Marilyn Elliott for_____          Date 3/12/2015
LANCE R. LEFLEUR, Director
Alabama Department of
Environmental Management
Post Office Box 301463
Montgomery, AL 36130-1463

(Signed copy bearing original signatures is filed as Doc. # 4-1 and is being maintained in the office of Filing Attorney Jason A. Dunn)

85

Signature Page for *United States of America* et al. *v. Defendant Continental Carbon Company,* Consent Decree

FOR OKLAHOMA DEPARTMENT OF ENVIRONMENTAL QUALITY


/s/ Scott Thompson_____    Date 3/10/2015
SCOTT A. THOMPSON
Executive Director



/s/ Laura J. Finley_____    Date 3/10/2015
LAURA J. FINLEY
Supervising Attorney, Air Quality Division

(Signed copy bearing original signatures is filed as Doc. # 4-1 and is being maintained in the office of Filing Attorney Jason A. Dunn)

Signature Page for *United States of America* et al. *v. Defendant Continental Carbon Company,* Consent Decree

FOR DEFENDANT, CONTINENTAL CARBON COMPANY


/s/ Dennis Hetu_____          Date  2/26/2015
DENNIS HETU
President
Continental Carbon Company

(Signed copy bearing original signature is filed as Doc. # 4-1 and is being maintained in the office of Filing Attorney Jason A. Dunn)


15-0290p008.PO.DOCX

**APPENDIX A:  ENVIRONMENTAL MITIGATION PROJECTS**

A.    Defendant shall spend at least $550,000, and shall comply with the requirements of this Appendix and with Section V (Environmental Mitigation) of the Consent Decree, to implement and secure the environmental benefits of the Environmental Mitigation Projects described below.  No less than $25,000 of the total $550,000 shall be spent in each of: Ponca City, Oklahoma, the State of Alabama, and Sunray, Texas on the Environmental Mitigation Projects described in Paragraph C of this Appendix.  No less than $200,000 of the total $550,000 shall be spent in each of: Ponca and Phenix on the Environmental Mitigation Projects described in Paragraph D of this Appendix.  Nothing in the Consent Decree or this Appendix shall require Defendant to spend any more than a total of $550,000 on Environmental Mitigation Projects.

B.    Within 120 Days from the Date of Entry, Defendant shall submit proposed plans ("Project Plans") to EPA and the applicable Plaintiff-Intervenor for review and approval pursuant to Section V of the Consent Decree (Review and Approval of Submittals) for spending $75,000 in Project Dollars for the energy efficiency Projects specified in Paragraph C of this Appendix.  EPA and the applicable Plaintiff-Intervenor reserve the right to disapprove any project after an analysis of its Project Plan if EPA and the applicable Plaintiff-Intervenor determine the Project Plan does not propose energy efficiency Projects that conform to the requirements of Paragraph C of this Appendix.

C.    Defendant shall propose Project Plans to spend at least $75,000 in Project Dollars for the purchase and installation of environmentally beneficial energy efficiency technologies designed to have long-lasting benefits and to minimize the use of electricity and/or natural gas at state, local, or Tribal government-owned buildings, schools, buildings owned by nonprofit organizations, commercial, and/or industrial buildings within Defendant's service territory.  Such energy efficiency Projects may include, but shall not be limited to (i) efficient heating and air conditioning systems in schools and government buildings, (ii) efficient lighting in such buildings and in local public areas, and (iii) solar powered lighting at local parks.

D.    Defendant shall spend at least $475,000 in Project Dollars for the purchase, installation, and use of continuous-duty, cartridge dust collector technology ("Dust Collectors") to minimize PM emissions from the carbon black product storage tanks at Ponca and Phenix.  The Dust Collectors shall replace existing bag filters and shall include cartridge filters utilizing nanofiber technology to provide high removal efficiency of PM.

E.    Defendant shall limit use of Project Dollars for third party administrative costs associated with implementation of any Environmental Mitigation Project to no greater than 10% of the total Project Dollars.

F.    Each Environmental Mitigation Project shall be completed by no later than four years from the Date of Entry of the Consent Decree.  Defendant may also accelerate its payments to better effectuate a proposed plan, but Defendant shall not be entitled to any

reduction in the nominal amount of the required payments by virtue of the early expenditures.  Any funds designated for a specific Environmental Mitigation Project that are left unspent, or are projected to be left unspent, after three years from the Date of Entry of the Consent Decree may be redirected by Defendant, after consultation with and approval by EPA and the applicable Plaintiff-Intervenor, to one or more projects of the type listed in Paragraph C of this Appendix  Any such redirected funds shall be spent by no later than five years from the Date of Entry of the Consent Decree.

G.    All proposed Project Plans shall include the following:

    1.    A plan for implementing the Project.

    2.    A summary-level budget for the Project.

    3.    A time line for implementation of the Project.

    4.    A description of the anticipated environmental benefits of the Project including an estimate of any emission reductions or mitigation expected to be realized, and the methodology and any calculations used in the derivation of such expected benefits, reductions, or mitigation.

H.    Upon approval by EPA and the applicable Plaintiff-Intervenor of the Project Plan(s) required by this Appendix, Defendant shall complete the approved Projects according to the approved Project Plan(s). Nothing in this Consent Decree shall be interpreted to prohibit Defendant from completing the Projects ahead of schedule.

I.    If Defendant opts not to perform a Project for which it has submitted a plan that has been approved by EPA and the applicable Plaintiff-Intervenor, then it shall indicate withdrawal from the Project in its next progress report due pursuant to Section XIII (Recordkeeping and Reporting Requirements) of the Consent Decree.

J.    The Parties recognize that implementation of the Environmental Mitigation Projects in this Appendix may require action by third parties, such as non-government entities and state or local government entities.  If Defendant is unable to complete an approved Environmental Mitigation Project in accordance with this Appendix due to inability to reach agreement with third parties, and that inability is not caused by, and is beyond the control of, Defendant, despite Defendant's best efforts to reach agreement regarding the Environmental Mitigation Project as set out in the Consent Decree, then EPA and Defendant may agree to (1) allow Defendant to amend the Environmental Mitigation Project description in this Appendix as appropriate to successfully complete the Environmental Mitigation Project, or (2) cancel the Environmental Mitigation Project and redirect any unspent funds for the Environmental Mitigation Project to one or more projects of the type listed in Paragraph C of this Appendix.

### APPENDIX B:  OTHER PM CONTROL REQUIREMENTS

| PM Emissions Equipment | PM Reduction Mechanism | Method for Managing PM Emissions |
|---|---|---|
| Carbon Black Product Storage Tank, Silo or Bin | PM emissions shall be directed to either (a) a fabric filtration device that is equipped with filters specified by their supplier to achieve a PM collection efficiency of at least 99%, or (b) a cartridge device that achieves a PM collection efficiency of at least 99%. | Provisions in Paragraphs 33 (Other PM Control Requirements) of this Consent Decree |
| Carbon Black Pellet Dryer | All PM emissions shall be directed to the Dryer Exhaust Bag Filter (for recovery of product). | Provisions in Paragraphs 33 (Other PM Control Requirements) and 35 (PM Early Warning System) of this Consent Decree |
| Reactor | All carbon black product and PM emissions generated by the reactor shall be vented to a Main Bag Filter.  Direct venting to the atmosphere of any carbon black product or PM emissions generated by the reactor is prohibited at all times. | Provisions in Paragraph 33 (Other PM Control Requirements) of this Consent Decree and 35 (PM Early Warning System) of this Consent Decree. |
| Main Bag Filters | During periods other than Heat Load Operation, reactor Startup and Shutdown and Malfunctions, the Main Bag Filter Heat Load Vents shall be closed. | Provisions in Paragraphs 33 (Other PM Control Requirements) and 35 (PM Early Warning System) of this Consent Decree |
| Sunray Unit 3 Pneumatic Loop Filter | All PM emissions shall be handled as part of the inherent process unit operations that employ fabric filtration to separate carbon black product, in accordance with the Compliance Assurance Monitoring Regulations under 40 C.F.R. Part 68. | Provisions in Paragraphs 33 (Other PM Control Requirements) and 35 (PM Early Warning System) of this Consent Decree |

**APPENDIX C:  PARTICULATE EMISSIONS BEST MANAGEMENT PRACTICES CONTROL PLAN**

The best management practices for minimizing particulate emissions described in this plan shall be followed at each of the Facilities at all times.

1. All operations and maintenance personnel shall be trained to both recognize leaks and spills of carbon black, and to report them to the proper plant personnel for response. Visual observation of the physical condition of plant process equipment that conveys, stores, loads, unloads, and packages carbon black, including at connection points between equipment and/or sections of piping, and of the physical condition of containers and bags used to package carbon black, shall be part of the daily responsibilities of the operations and maintenance personnel to help ensure that potential leaks are addressed before they occur.

2. All carbon black product shall be stored in tanks, silos, or closed bags. No carbon black product shall be stored in open piles.

3. All product and off-quality carbon black shall be shipped off-site in closed bags, sealed cardboard boxes (for landfill), or sealed rail cars, hoppers, or bulk transport trucks.

4. All process equipment at the Facilities shall be designed, operated, and maintained in a manner intended to minimize leaks and spills of carbon black and fugitive particulate emissions.  In addition, the Facilities shall develop and implement practices to collect carbon black dust otherwise emitted from product conveyance, packaging, and storage operations, and either recycle it back into the manufacturing process or convey it to a packaging system.  Where practicable, the operation of such equipment, including carbon black product conveyors, elevators, and packing units, shall be conducted under negative pressure and served by vacuum systems that collect carbon black.

5. All process equipment shall be located either indoors or in outdoor areas that have paved or rock/gravel ground surfaces.

6. Events that trigger the PM Early Warning System shall be handled pursuant to the protocol in Appendix D (PM Early Warning System) of this Consent Decree.  Leaks and spills of all carbon black that are otherwise identified shall be investigated and addressed (cleaned up and repaired) either immediately upon discovery or as quickly as practicable. When immediate repair or isolation is not feasible, the actions taken to complete the repair shall be documented.  Incident reports for spills or leaks of carbon black shall be created to document cause and corrective actions.

7. Special precautions shall be taken during maintenance actions to minimize particulate emissions from the equipment on which maintenance is being performed.  Prior to conducting maintenance or baghouse bag replacement on equipment that is prone to accumulation of carbon black on its interior surfaces, including, but not limited to, on the Main Bag Filters, elevators and conveyors, and storage tanks and silos, the responsible maintenance personnel shall identify and take steps necessary to minimize the generation

C2

of particulate emissions at the equipment being maintained during the maintenance or bag replacement activity.  The specific approaches taken to minimize particulate emissions during maintenance or bag replacement shall be developed on a case-specific basis based on the judgment of the maintenance personnel and shall include, as relevant, but need not be limited to, activities such as the following:

- vacuuming carbon black from the equipment prior to beginning the maintenance,
- vacuuming or washing down the equipment when an appropriate stage in the maintenance activity has been reached,
- if units are equipped with vents, closing vents during maintenance to prevent drafting of PM, except when Defendant conducts a safety or hazard analysis and concludes in writing that closing the vent would create an unsafe or unhealthy work atmosphere, and
- sealing filter bags removed from Main Bag Filters inside plastic bags.

8.    Accessible floor and/or ground surfaces in the carbon black production areas shall be swept or washed as needed in order to minimize particulate emissions attributable to leaks or spills of carbon black that are not otherwise identified and/or addressed during the daily Visual Assessments conducted pursuant to Paragraph 33 of this Consent Decree. All material collected through these actions shall either be incorporated into the production process/used as product for commercial distribution or properly disposed of in accordance with applicable regulatory standards.

**APPENDIX D:  PM EARLY WARNING SYSTEM**

1.    Defendant shall install a PM Early Warning System at each of its Facilities to monitor the PM emitted from each PM Monitor Point.  Each PM Monitor Point shall be set to a specific alarm action level, such that an alarm is triggered when the PM at a PM Monitor Point exceeds the normal range of PM according to the manufacturer's recommendations during operation of the Process System.

2.    By the dates in the table below, Defendant shall submit for Plaintiffs' approval, alarm action levels for each PM Monitor Point, in accordance with Paragraph 1 of this Appendix D, and Defendant shall set each PM Early Warning System to such alarm action levels:

| Process System | Action Level Approval Date | Action Level Set Date |
|---|---|---|
| Sunray Process System | 4/1/2016 | 5/1/2016 |
| Ponca Process System | 7/1/15 | 8/1/15 |
| Phenix Process System | 7/1/15 | 8/1/15 |

3.    Defendant shall operate each PM Early Warning System at all times of Heat Load Operation and Process System Operation, except for during system breakdowns, repairs, maintenance, calibration checks, and zero and span adjustments of the applicable PM Early Warning System.  For purposes of demonstrating compliance with the requirements in Paragraph 2 of this Appendix D, the minimum degree of data availability shall be at least 90 percent for the first three years following the Effective Date of the Consent Decree, and 95% thereafter, based on a quarterly average of the operating time of the emission unit or activity being monitored.

4.    In the event that an alarm is triggered for any PM Early Warning System, Defendant shall investigate the cause of the alarm as expeditiously as practicable by performing each of the following tasks:

   a.    Reviewing the data output for the relevant PM Early Warning System to determine whether the alarm corresponds to an actual exceedance of the alarm action level;

D1

b.  If review of the data confirms an exceedance of the alarm action level, Defendant shall conduct a visual assessment (Method 22) of the equipment monitored by the pertinent PM Early Warning System to determine if there are any detectable visual emissions. Defendant shall also conduct an appropriate equipment inspection to seek to identify the source of the alarm.

c.  If the visual assessment or other observations identify a process, equipment or other condition(s) causing an increase in PM emissions that may be responsible for triggering the relevant alarm, determining whether the relevant equipment can be isolated to reduce the excess PM emissions below alarm levels, without requiring a Process System Shutdown;

d.  If the relevant equipment can be isolated without requiring Process System Shutdown, isolating and repairing such equipment prior to returning it to service;

e.  If the relevant equipment cannot be isolated without requiring Process System Shutdown, such as if there is a leak from a dryer, a broken bag in a baghouse, or a Malfunction of any other component that cannot be isolated to the extent necessary to prevent continued excess PM emissions, shutting down the relevant equipment and only returning it to service after it has been repaired;

f.  If the triggering event has not been identified and resolved within 24 hours, having a Method 9 Trained Observer (i) conduct a visual assessment of the equipment monitored by the pertinent PM Early Warning System to determine if there are any detectable visual emissions, and, (ii) in the event that any such visible emissions are observed, conduct a six minute observation in accordance with Method 9 to determine if opacity levels are greater than 20%, and (iii) if opacity levels are greater than 20%, conduct a six minute observation in accordance with Method 9 once every 8 hours (during daylight hours) until visible emissions are less than 20% of opacity levels;

g.  If, after investigation, the source of any elevated PM emissions cannot be identified, shutting down the subject equipment as soon as practicable to prevent further alarms and to minimize emissions and ensure the safety of employees and the community and only returning the equipment to service after the source of the excess emissions has been identified and repaired.

5.  Notwithstanding the foregoing, to the extent that recorded information for the relevant PM Early Warning System indicates that operations have returned to normal operating ranges, below levels triggering an alarm condition, Defendant is not otherwise obligated to continue with implementation of the steps listed above, and may continue operation of the relevant equipment.

6.    Defendant shall maintain a record of any event that triggers the alarm for any PM Early Warning System sufficient to meet the requirements in Section XIII (Recordkeeping and Reporting Requirements) of this Consent Decree.

7.    Defendant shall perform routine maintenance of each PM Early Warning System installed pursuant to this Appendix D and Paragraph 35 of this Consent Decree in accordance with any manufacturer recommendations and the following requirements:

a.    On at least a semiannual basis, Defendant shall visually inspect and clean each sensor within the PM Early Warning System, in accordance with manufacturer recommendations, to ensure continued effective operation of the PM Early Warning System.

b.    On at least an annual basis, Defendant shall comprehensively inspect the PM Early Warning System and make any necessary repairs.

**8.**    The PM Early Warning System shall not be required to quantitatively measure PM emissions.

**APPENDIX E:  PROTOCOL FOR SETTING FINAL SO₂ EMISSION LIMITS**

1.    If Defendant elects to comply with the applicable Final 7-day Rolling Average Emissions Limits and Final 365-day Rolling Average Emissions Limits for SO₂ set forth in Section VI (SO₂ Control Technology, Emissions Limits, and Monitoring Requirements) of this Consent Decree, pursuant to Option B, the Parties shall follow the protocol specified in this Appendix E.

2.    <u>Design Considerations.</u>  Defendant's proposed design for each DGS or WGS shall consider, at a minimum, the following parameters:

 a. Absorber Vessel

  i. Volume
  ii. Dimensions
  iii. Pressure Drop
  iv. Internal Configuration
  v. Location in Process Train

 b. Scrubbing Liquor (for WGS only)

  i. Scrubbing Liquor Blowdown/Makeup
  ii. Scrubbing Liquor Circulation Rate
  iii. Scrubbing Liquor pH

 c. Sorbent Injection (for DGS only)

  i. Type and chemical composition of sorbent
  ii. Sorbent injection rate

 d. Flue Gas Characteristics

  i. Inlet/Outlet SO₂/SO₃ Concentrations
  ii. Flue Gas Volumetric Flow
  iii. Inlet/Outlet Temperature Range
  iv. Inlet/Outlet Particulate Loading and Characteristics

 e. Designed to Removal Efficiency

 f. Safety Considerations

If Defendant elects to pursue installation of an Alternative Equivalent Pollution Control Technology, Defendant shall propose a list of design considerations and operating parameters with supporting rationale for use in lieu of those listed in Paragraphs 2 and 3 of this Appendix E for the Alternative Equivalent Pollution Control Technology that

includes design considerations and operating parameters that have a significant effect on percent removal of $SO_2$.  Defendant shall submit this information when Defendant submits the proposal for approval of the Alternative Equivalent Pollution Control Technology in accordance with Paragraph 19 of this Consent Decree.

3.   <u>Optimization and Demonstration Study.</u>  Defendant shall conduct an 18 Month Optimization and Demonstration Study, which shall begin no later than the applicable Date of Continuous Operation set forth in Paragraph 17 of this Consent Decree. Defendant shall submit a protocol consistent with the applicable design considerations for each Optimization and Demonstration Study to EPA no later than 3 Months prior to commencement of the Optimization and Demonstration Study, which shall identify, at a minimum, the operating parameters set forth in 3.a. and 3.b. below.  During the first 3 Months of each Optimization and Demonstration Study, Defendant shall operate the applicable DGS or WGS or Alternative Equivalent Pollution Control Technology consistent with the protocol submitted by Defendant, with the objective of establishing optimum operating levels to minimize $SO_2$ emissions for, at a minimum, the following parameters:

   a.   Scrubbing Liquor (for WGS only)

      i.    Scrubbing Liquor/Caustic Blowdown/Makeup
      ii.   Scrubbing Liquor Circulation Rate
      iii.  Scrubbing Liquor pH

   b.   Sorbent Injection (for DGS only)

      i.    Type and chemical composition of sorbent
      ii.   Sorbent injection rate

   c.   Pressure drop

   d.   Emission Rates

      i.    Outlet $SO_2$ Concentration
      ii.   Actual Removal Efficiency

Within 30 Days of completion of the first 3 Months of each Optimization and Demonstration Study, Defendant shall submit to EPA a written report that documents any conclusions that it reached in its analysis of the data from that period, and provides any relevant data supporting those conclusions.

During the last 15 Months of each Optimization and Demonstration Study, Defendant shall operate the applicable DGS or WGS or Alternative Equivalent Pollution Control Technology in a manner consistent with the conclusions reflected in the written report of

the Optimization and Demonstration Study, with the objective of minimizing $SO_2$ emissions to the extent practicable based on the design criteria.

4.    Optimization and Demonstration Study Report.  Defendant shall submit the results of the complete Optimization and Demonstration Study to EPA in a written report no later than 60 Days after the completion of the Optimization and Demonstration Study.  The report shall include the following information:

a.    Each hourly average $SO_2$ and $O_2$ concentration at the point of emission to the atmosphere and at the inlet to the DGS or WGS or Alternative Equivalent Pollution Control Technology, as measured by a CEMS during the Optimization and Demonstration Study, and each hourly average value for each of the operating parameters listed in Paragraph 3 of this Appendix E.

b.    An evaluation of the effect, and identification of the optimum operating level, of each operating parameter listed in Paragraph 3 of this Appendix E, on the minimization of $SO_2$ emissions from the relevant Process System.

c.    A proposed final 7-day Rolling Average Emissions Limit (in ppmvd, at 0% oxygen), and a proposed final 365-day Rolling Average Emissions Limit for $SO_2$ (in ppmvd, at 0% oxygen), within the range set forth for Option B in the applicable cell in the table in Paragraph 17, to optimize operation of the DGS or WGS or Alternative Equivalent Pollution Control Technology and minimize $SO_2$ emissions to the extent practicable.

Defendant shall supplement the report with any other information that EPA identifies as relevant to its evaluation of the Optimization and Demonstration Study.

5.    Compliance with Proposed Final Emissions Limits.  Defendant shall immediately upon submission of the Optimization and Demonstration Study to EPA, and, continuing thereafter, until such time as Defendant is required to comply with the applicable Final 7-day Rolling Average Emissions Limit and Final 365-day Rolling Average Emissions Limit established pursuant to Paragraphs 6 and 7 of this Appendix E, Continuously Operate, a DGS or WGS or Alternative Equivalent Pollution Control Technology on each Process System specified in the table in Paragraph 17 to this Consent Decree, so as to achieve and maintain the applicable proposed final 7-day Rolling Average Emissions Limit and proposed final 365-day Rolling Average Emissions Limit.

6.    EPA Establishment of Final Emission Limits.  EPA, after consultation with Plaintiff-Intervenors, shall establish Final 7-day Rolling Average Emissions Limits and Final 365-day Rolling Average Emissions Limits for $SO_2$ within the range set forth for Option B in the applicable cell in the table in Paragraph 17.  EPA shall base its determination on: (i) the level of performance of the applicable DGS or WGS or Alternative Equivalent Pollution Control Technology during the Optimization and Demonstration Study; (ii) a reasonable certainty of compliance; and (iii) any other available and relevant information.

E3

7.  <u>Compliance with Final Emission Limits.</u>  Defendant shall immediately, or, if the EPA-established Final 7-day Rolling Average Emissions Limit or Final 365-day Rolling Average Emissions Limit for $SO_2$ for the applicable Process System is different from Defendant's proposed final Emissions Limits, no later than 30 Days after receipt of written notice from EPA, and, continuing thereafter, Continuously Operate, a DGS or WGS or Alternative Equivalent Pollution Control Technology on each Process System specified in the table in Paragraph 17 to this Consent Decree, so as to achieve and maintain the applicable Final 7-day Rolling Average Emissions Limit and Final 365-day Rolling Average Emissions Limit.

8.  <u>Emissions Limits Option</u>.  At any time, Defendant may notify the EPA and Plaintiff-Intervenors in writing in accordance with the notice provisions of Section XXI (Notices) of this Consent Decree that it will accept and agree to immediately, and continuing thereafter Continuously Operate, a DGS or WGS or Alternative Equivalent Pollution Control Technology on each Process System specified in the table in Paragraph 17 of this Consent Decree, so as to achieve and maintain the Final 7-day Rolling Average Emissions Limits and Final 365-day Rolling Average Emissions Limits for $SO_2$ set forth for Option A in the applicable cell in the table in Paragraph 17.

**APPENDIX F:  PROTOCOL FOR SETTING FINAL NO$_x$ EMISSION LIMITS AT SUNRAY**

1. If Defendant elects to comply with the applicable Final 7-day Rolling Average Emissions Limits and Final 365-day Rolling Average Emissions Limits for NO$_2$ at Sunray set forth in Section VII (NOx Control Technology, Emissions Limits, and Monitoring Requirements) of this Consent Decree, pursuant to Option B, the Parties shall follow the protocol specified in this Appendix F.

2. <u>Design Considerations.</u>  Defendant's proposed design for each Low-NOx Combustion System shall consider, at a minimum, the following parameters:

   a. Burner Outlet Flue Gas Characteristics

      i. Outlet NOx Concentrations
      ii. Flue Gas Volumetric Flow
      iii. Outlet Temperature Range

   b. Over Fire Air Criteria

      i. Combustion air rate
      ii. Over Fire Air Rate

   c. Low-NOx Burner Criteria

      i. Manufacturer and model of Low-NOx Burner
      ii. Expected NOx concentration for burning natural gas in ppmvd at 0% O2
      iii. Size of burners in mmbtu/hour and number of burners

   d. Designed to O2 level

   e. Safety Considerations

   If Defendant elects to pursue installation of an Alternative Equivalent Pollution Control Technology, Defendant shall propose a list of design considerations and operating parameters with supporting rationale for use in lieu of those listed in Paragraphs 2 and 3 of this Appendix F for the Alternative Equivalent Pollution Control Technology that includes design considerations and operating parameters that have a significant effect on percent removal of NOx.  Defendant shall submit this information when Defendant submits the proposal for approval of the Alternative Equivalent Pollution Control Technology in accordance with Paragraph 28 of this Consent Decree.

3. <u>Optimization and Demonstration Study.</u>  Defendant shall conduct an 18 Month Optimization and Demonstration Study, which shall begin no later than the applicable Date of Continuous Operation set forth in Paragraph 26 of this Consent Decree.

Defendant shall submit a protocol consistent with the applicable design considerations for each Optimization and Demonstration Study to EPA no later than 3 Months prior to commencement of the Optimization and Demonstration Study, which shall identify, at a minimum, the operating parameters set forth in 3.a. and 3.b. below.  During the first 3 Months of each Optimization and Demonstration Study, Defendant shall operate the applicable Low-NOx Combustion System or Alternative Equivalent Pollution Control Technology consistent with the protocol submitted by Defendant, with the objective of establishing optimum operating levels to minimize NOx emissions for, at a minimum, the following  parameters:

    a.      Overfire Air: maximizing the effectiveness of the Overfire Air

    b.      O2 (minimizing O2 should minimize NOx and a specific O2 level shall be established during the Optimization and Demonstration Study)

    c.      Emission Rates: Outlet NOx Concentration

Within 30 Days of completion of the first 3 Months of each Optimization and Demonstration Study, Defendant shall submit to EPA a written report that documents any conclusions that it reached in its analysis of the data from that period, and provides any relevant data supporting those conclusions.

During the last 15 Months of each Optimization and Demonstration Study, Defendant shall operate the applicable Low-NOx Combustion System or Alternative Equivalent Pollution Control Technology in a manner consistent with the conclusions reflected in the written report of the Optimization and Demonstration Study, with the objective of minimizing NOx emissions to the extent practicable based on the design criteria.

4.      Optimization and Demonstration Study Report.  Defendant shall submit the results of the complete Optimization and Demonstration Study to EPA in a written report no later than 60 Days after the completion of the Optimization and Demonstration Study.  The report shall include the following information:

    a.      Each hourly average NOx and $O_2$ concentration at the point of emission to the atmosphere, as measured by a CEMS during the Optimization and Demonstration Study, and each hourly average value for each of the operating parameters listed in Paragraph 3 of this Appendix F.

    b.      An evaluation of the effect, and identification of the optimum operating level, of each operating parameter listed in Paragraph 3 of this Appendix F, on the minimization of NOx emissions from the relevant Process System.

    c.      A proposed final 7-day Rolling Average Emissions Limit (in ppmvd, at 0% oxygen), and a proposed final 365-day Rolling Average Emissions Limit for NOx (in ppmvd, at 0% oxygen), within the range set forth for Option B in the

applicable cell in the table in Paragraph 26, to optimize operation of the Low-NOx Combustion System or Alternative Equivalent Pollution Control Technology and minimize NOx emissions to the extent practicable.

Defendant shall supplement the report with any other information that EPA identifies as relevant to its evaluation of the Optimization and Demonstration Study.

5.    Compliance with Proposed Final Emissions Limits.  Defendant shall immediately upon submission of the Optimization and Demonstration Study to EPA, and, continuing thereafter, until such time as Defendant is required to comply with the applicable Final 7-day Rolling Average Emissions Limit and Final 365-day Rolling Average Emissions Limit established pursuant to Paragraphs 6 and 7 of this Appendix F, Continuously Operate, a Low-NOx Combustion System or Alternative Equivalent Pollution Control Technology on each Process System specified in the table in Paragraph 26 to this Consent Decree, so as to achieve and maintain the applicable proposed final 7-day Rolling Average Emissions Limit and proposed final 365-day Rolling Average Emissions Limit.

6.    EPA Establishment of Final Emission Limits.  EPA, after consultation with Plaintiff-Intervenors, shall establish Final 7-day Rolling Average Emissions Limits and Final 365-day Rolling Average Emissions Limits for NOx within the range set forth for Option B in the applicable cell in the table in Paragraph 26.  EPA shall base its determination on: (i) the level of performance of the applicable Low-NOx Combustion System or Alternative Equivalent Pollution Control Technology during the Optimization and Demonstration Study; (ii) a reasonable certainty of compliance; and (iii) any other available and relevant information.

7.    Compliance with Final Emission Limits.  Defendant shall immediately, or, if the EPA-established Final 7-day Rolling Average Emissions Limit or Final 365-day Rolling Average Emissions Limit for NOx for the applicable Process System is different from Defendant's proposed final Emissions Limits, no later than 30 Days after receipt of written notice from EPA, and, continuing thereafter, Continuously Operate, a Low-NOx Combustion System or Alternative Equivalent Pollution Control Technology on each Process System specified in the table in Paragraph 26 to this Consent Decree, so as to achieve and maintain the applicable Final 7-day Rolling Average Emissions Limit and Final 365-day Rolling Average Emissions Limit.

8.    Emissions Limits Option.  At any time, Defendant may notify the EPA and Plaintiff-Intervenors in writing in accordance with the notice provisions of Section XXI (Notices) of this Consent Decree that it will accept and agree to immediately, and continuing thereafter Continuously Operate, a Low-NOx Combustion System or Alternative Equivalent Pollution Control Technology on each Process System specified in the table in Paragraph 26 of this Consent Decree, so as to achieve and maintain the Final 7-day Rolling Average Emissions Limits and Final 365-day Rolling Average Emissions Limits for NOx set forth for Option A in the applicable cell in the table in Paragraph 26.

F3